# In re Bear

C.P. of Dauphin County, no. 3101 S 1999.

*William Fetterhoff,* for petitioner.
*Yvonne Husic,* for intervenors.
*John Fabriele,* assistant public defender, for Steven Bear.
*Kevin Casey,* amicus curiae.

TURGEON, *J.,* December 2, 1999—The issue presented is whether this court should involuntarily commit Steven Bear, a profoundly retarded adult who has resided at a state center for 44 years, into a community residential program against the vehement objections of his parent-guardians, Leon and Lillian Bear. The commitment is sought by the Dauphin County Mental Health/ Mental Retardation case management unit, which argues he must be transferred to the community residential program as the "least restrictive alternative."

## FACTUAL BACKGROUND

Steven Bear, currently 47 years old, was born March 6, 1952 in Dauphin County to his parents, Leon and Lillian Bear. Since the age of 3, Steven has been receiving residential care at Selinsgrove State Center, Snyder County, where his father, upon medical advice, voluntarily admitted him in 1955.

Steven is profoundly mentally retarded. He has a mental age of approximately 10 months with an IQ between 6 and 14. At a very young age, he was diagnosed microcephalic and later diagnosed with cerebral palsy, spastic quadriplegia, scoliosis, chest deformities, vision problems and occasional seizures. He is fed through a stom-

ach tube, has complications of Bells palsy and cannot speak, although he communicates with facial gestures, body posture and by uttering distinguishing groans and other guttural sounds. He is wheelchair bound, and although he has limited use of his hands, he is somewhat proficient at manually operating his wheelchair. Steven requires 24-hour supervision and needs assistance to bathe, dress and get into and out of bed. He can toilet himself with some assistance. Steven is, however, a socially gregarious fellow who is acutely aware of people and evidences a desire to be around them. He thrives on interaction with those familiar to him and seeks out contact with people. In addition, he is able to follow simple instructions and can make simple choices. (N.T. 65-68, 127, 184-85, 228; exhibit P-14 pp. 4-5.)

Discussions about moving Steven to a community-based facility were first raised in 1987 by Dauphin County MH/MR. Dauphin County MH/MR undertakes the annual plan and care of all mentally retarded Dauphin County residents, even after they require placement outside the county. (N.T. 117.) The proposed placement was raised pursuant to the federal government's 1981 Medicaid waiver program, which provided states with funding for state-run home and community-based care for mentally retarded individuals. At the time, Steven's MH/MR case manager informed the Bears that the waiver program was intended to provide smaller community-based living arrangements which enable higher staff-to-client ratio, intense programming based on individual needs and opportunities to increase social and community integration. In light of the Bears' strong opposition,

the case manager decided not to move Steven from Selinsgrove Center; however, the Bears were informed that MH/MR would continue to seek a suitable future placement for Steven. (N.T. 48.)

During the subsequent years, planning for his transition to community residential care was conducted by the Dauphin County MH/MR case management unit in cooperation with the Dauphin County MH/MR program and Selinsgrove staff, including consultation with Steven's parents. This process accelerated in 1998 as part of Dauphin County MH/MR's goal to outplace the remaining 16 Dauphin County residents, still in Selinsgrove Center, into Dauphin County community-based housing by the conclusion of fiscal year 1999-2000. (N.T. 153; exhibit I-11.) In August 1998, a team of social workers concluded that Steven would benefit from community placement. (N.T. 36.) Thereafter, Dauphin County MH/MR and Selinsgrove Center staff collaborated in drafting a lifestyle plan for Steven which identified his community living needs, preferences, dislikes, and outlining how transition could best be accomplished. (Exhibit P-13.)

Although they opposed the move, the Bears cooperated with MH/MR by attending several meetings and visiting three proposed community residences. (N.T. 38-42.) They did not tour the currently proposed home since it had not yet been identified by MH/MR as a possible home for Steven. However, they felt Steven's best interests would be served by remaining in Selinsgrove Center and requested the transition process stop. Nevertheless, MH/MR, in conjunction with Selinsgrove Center

and DPW staff, proceeded with plans for Steven's transition to community living.

When it became apparent to the Bears that Steven would be moved despite their wishes, they requested, on March 24, 1999, a DPW hearing as required by the Medicaid waiver program regulations. The Dauphin County MH/MR program attorney responded that their hearing request was premature since the community-based housing ultimately chosen might not involve one funded under the Medicaid waiver plan. Furthermore, the Bears were advised that even if a waiver-funded home were found for Steven, the right to a hearing rested with Steven or his duly appointed legal representatives, not the Bears, as they had not been adjudicated his legal representatives for the purpose of the waiver program fair hearing process. (Exhibit I-9.)

Accordingly, on April 12, 1999, the Bears filed a petition in Snyder County to adjudicate Steven incapacitated and seeking guardianship status over his person.[1] (Exhibit I-13.) Steven was not represented by counsel and the petition was uncontested. On May 14, 1999, Judge Harold Woelfel issued a decree finding Steven totally impaired and appointing the Bears permanent plenary guardians of the person. (Exhibits I-14 and 15.) The decree specifically granted the Bears with authority and responsibility to decide where Steven lived, how his meals, personal care, transportation and recreation would be provided and also power to authorize and consent to his medical treatment. (*Id.*)

---

1. The guardian office at Selinsgrove had been appointed plenary guardian of Steven's estate 12 years earlier, on January 6, 1987.

Dauphin County MH/MR continued their placement process, having Steven psychologically and medically evaluated. He was found to be profoundly mentally retarded, considered a substantial risk to himself and in need of residential placement.

On July 27, 1999, Dauphin County MH/MR, through nominal petitioner Luana K. Brown, a mental retardation case manager, filed a petition for Steven's involuntary commitment with this court pursuant to section 406 of the Mental Health and Mental Retardation Act of 1966. 50 P.S. §4406. Petitioner sought to terminate Steven's Selinsgrove Center commitment and transfer him to an appropriate community-based program, claiming Steven was entitled to receive mental retardation services in the least restrictive setting consistent with his needs. Petitioner averred its team of professionals had determined community-based treatment was appropriate for Steven. At the time the petition was filed, petitioner had not identified the placement; however, it later specifically sought to commit Steven to a recently purchased three-bedroom community ranch home in Dauphin County owned and managed by the Allegheny Valley School. A hearing on the petition was held on October 22, 1999.

AVS is a nonprofit agency serving mentally retarded individuals throughout Pennsylvania. It first became involved with Steven's case after attending a November 1998 meeting. Its team submitted a proposal to Dauphin County MH/MR, based upon the lifestyle plan, to provide community services for Steven. In March 1999, AVS was notified it had been chosen to find Steven an appro-

priate community-based home in the Harrisburg area. (N.T. 40-42, 84.)

## LEGAL DISCUSSION

The parties have raised numerous issues, including some of the most difficult—from a human perspective—presented to this court to date and some of which, we are advised, are of first impression under Pennsylvania law:[2]

(1) Whether Dauphin County was an improper and/or inconvenient venue?

(2) Whether the Bears had standing to oppose the commitment petition?

(3) Whether the public defender's office could represent Steven Bear?

(4) Whether Dauphin County MH/MR had standing to petition for Steven Bear's involuntary commitment?

(5) Whether Dauphin County Court or the Pennsylvania Department of Public Welfare was the correct forum to hear this action?

(6) Whether Selinsgrove Center or the community-based home is the most appropriate residency placement for Steven Bear under the MH/MR Act of 1966?

(7) Whether Selinsgrove Center or the community-based home provides the least restrictive alternative?

---

2. Similar issues are also currently pending in a Venango County common pleas court action. *In re Ruth Easly,* no. civ. 959-1999 (Venango C.P.). In that case, the state filed a commitment petition seeking to remove a 77-year-old mentally retarded woman from Polk State, where she has resided for over 40 years, to a group home, arguing it was the least restrictive alternative mandated under the law. Her entire family opposes the move.

## 1. *Prehearing Issues*

### Venue

The Bears' motion seeking a change of venue to Snyder County was denied September 3, 1999, as was their subsequent reconsideration motion. In their motion, they averred that Dauphin County venue was improper under Pennsylvania Rule of Civil Procedure 1006(a) which, as applied here, provides that venue is proper in a county in which Steven could be served, where the cause of action arose or where the transaction or occurrence took place out of which the cause of action arose. Pa.R.C.P. 1006(a).[3] Assuming Rule 1006 is applicable, the Bears' argument was nevertheless flawed since Dauphin County was a county in which Steven could be served. As an incapacitated person, service upon him may be made by personal service upon his guardian(s). Pa.R.C.P. 421(2) (renumbered at Pa.R.C.P. 402(b)). Since the Bears are Dauphin County residents, they can receive personal service here. Additionally, Dauphin County is the county where the transaction out of which this action arose. Dauphin County MH/MR undertook the annual case management and review of Steven's case, funded and created a community residence program for Steven in conjunction and consultation with and funding from DPW, which offices

---

3. We note that the Bears did not raise in their motion that venue was improper under MH/MR Act, section 406 which specifically provides that a petition for involuntary commitment is to be presented "to the court of common pleas of the county in which a person resides or is . . . ." 50 P.S. §4406.

are also located in Dauphin County. Thus, Dauphin County venue was proper under Rule 1006.[4]

To the extent the Bears were seeking a venue transfer alleging Dauphin County was an inconvenient forum, their motion was also denied. They argued Snyder County venue was more convenient to them and their witnesses, noting their son's lengthy Snyder County institutionalization, all the records located in the Selinsgrove Center and that their witnesses familiar with Steven, who could support their opposition to the commitment petition, were from Selinsgrove Center. Given the great deference the court gives the moving party's forum choice and considering the Bears' failure to aver, much less establish, that Dauphin County venue is oppressive or vexatious to them, their forum nonconveniens challenge failed. See *McCrory v. Abraham*, 441 Pa. Super. 258, 265-66, 657 A.2d 499, 501-502 (1995), *alloc. denied*, 544 Pa. 652, 676 A.2d 1194 (1996).

## Standing of Steven Bear's Parents

The Bears' party status and the weight given to their preferred living arrangement for their son were at issue

---

4. A separate venue objection not raised in pleadings but raised in the Bears' brief was that Dauphin County venue was improper because proceedings in this matter had been previously transferred to Snyder County. The Bears point to a court order whereby Dauphin County relinquished jurisdiction to Snyder County. However, it is clear from a review of this order and in the context of previous proceedings that the order dealt solely with issues of guardianship raised under the Guardianship Act and not issues raised pursuant to an MH/MR Act commitment petition. Thus, to the extent Dauphin County relinquished jurisdiction, it was only with regard to guardianship issues.

throughout the commitment proceeding. Dauphin County MH/MR first raised the issue by claiming the Bears lacked standing to file a motion challenging venue. In addition, it also objected to the fact that the Bears had filed various pleadings identifying themselves in the caption as "respondents."[5] Ultimately, the Bears were granted permission to participate as intervenors upon their unopposed oral motion presented at the commitment hearing. (N.T. 32.) See Pa.R.C.P. 2327(4).

A party seeking judicial resolution of a controversy in this Commonwealth must establish their standing. *Bergdoll v. Kane,* 557 Pa. 72, 731 A.2d 1261, 1268 (1999). The core concept of standing is that the person must be aggrieved. *Id.* A person is aggrieved when he or she has a substantial, direct and immediate interest in the claim sought to be litigated. *Id.*

"A 'substantial' interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law. A 'direct' interest requires a showing that the matter complained of caused harm to the party's interest. An 'immediate' interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it. . . ." *Id.* (citation omitted)

Clearly, the Bears, as parents and appointed guardians of Steven, had standing to participate in this action.[6] Their

---

5. Petitioner filed a motion seeking to conform the case caption to disallow the Bears from filing documents listing themselves as representing their son as his parents and guardians. That motion was granted.

6. This determination, however, is not dispositive of whether the Bears ultimately have the right to decide where their son should live, which is discussed *infra.*

interest in the outcome of the litigation obviously surpasses that of the general citizenry in obtaining compliance with the law. As parents who have been actively involved in their profoundly mentally retarded son's life, the Bears' interest in where he lives is obvious. (N.T. 140, 179, 194.) Furthermore, although no state statute or regulation specifically provides party status for an adult incompetent's parents in a section 406 commitment proceeding, this court believes parental participation certainly should never be denied. In *Heller v. Doe,* 509 U.S. 312 (1993), the Supreme Court rejected an argument that a Kentucky statute, granting party status to close family members and guardians in mental retardation commitment proceedings, violated the due process rights of the mentally retarded. The court stated that "[t]here is no support whatever in our cases or our legal tradition for the 'statist notion,' that the state's expertise and concern in these matters is so superior to that of parents and other close family members that the state must slam the courthouse door against those interested enough to intervene." *Id.* at 332-33. (citation omitted) The court concluded that allowing close relatives and guardians to participate increases a proceeding's accuracy and implements the state's interest in providing family members a voice in such proceedings. *Id.* at 333.

In addition, as guardians, the Bears have a substantial interest in this matter since they have a statutory duty to act in their ward's best interests and to participate in the development of his supportive services plan. 20 Pa.C.S. §5521(a). The Bears' interest is also direct since the proposed consequence of the action is the potential reloca-

tion of their son from his home of 44 years which may potentially affect his quality of life and lifespan. They also have an immediate interest to ensure he will be placed in the appropriate home. See *Bahian v. PennDPW,* 89 Pa. Commw. 644, 493 A.2d 803 (1985) (Blatt, J.) (parents had standing to ensure DPW provided their minor son with appropriate MR services). It was thus appropriate to allow the Bears to fully participate in the commitment hearing and present all testimony, evidence and legal arguments in support of their position.

### Public Defender Representation of Steven Bear

Prior to the commitment hearing, an assistant public defender undertook Steven's legal representation upon notification of the case by the MH/MR office. Counsel filed a concurrence with Dauphin County MH/MR's petition seeking to move Steven from Selinsgrove Center. The Bears filed a motion to disqualify the public defender's office from representing their son. This motion was denied following argument held immediately prior to the commitment hearing. (N.T. 5-19.)

The Bears argued the public defender should have been prohibited from representing Steven because such representation conflicted with their fiduciary duties as court-appointed guardians. They argued it was in Steven's best interests that they hire private legal counsel on his behalf, to advocate remaining in Selinsgrove Center. Dauphin County MH/MR argued private counsel, hired and paid by parents, could not have represented Steven because counsel would have had a conflict of interest between the parents' wish to keep Steven institutionalized

and Steven's best interest and legal entitlement to reside in the least restrictive environment—the proposed community home.

Steven's public defender undertook his representation under the Public Defender's Act which provides the public defender's office, upon court approval, shall represent persons subject to involuntary commitment proceedings under MH/MR Act. 16 P.S. §9960.6(c). Steven's counsel, having reviewed all pleadings and other records, informed the court he could adequately represent Steven. Although he admitted he had not spoken with Steven until immediately prior to the hearing, he explained, due to his client's mental status, more extensive consultations would not have been fruitful or warranted. (N.T. 14.) It was noted all witnesses were present to begin the commitment hearing, including those subpoenaed by the Bears in support of their opposition to the commitment petition, thus all viewpoints would be presented to the court in any event. Therefore, we determined private counsel was unnecessary, and hiring new counsel would unnecessarily delay proceedings. Thus, we permitted the assistant public defender to continue Steven's legal representation at the commitment hearing.[7]

---

7. We note Steven's interests were also "advocated" by Pennsylvania Protection and Advocacy Inc. which filed an amicus curiae brief. PP&A is a nonprofit corporation designated by the governor as the agency charged with protecting and advocating the rights of Pennsylvanians with developmental disabilities, both mental and physical, pursuant to the Developmental Disabilities Assistance Bill of Rights. 42 U.S.C. §6000 et seq. (N.T. 167.) One of the central tenets of PP&A's mission is to move individuals such as Steven Bear from isolated institutions into community residential settings. PP&A's authority to advocate for Steven, by getting him to make a mark on their consent

## Standing of Dauphin County MH/MR

One day prior to the commitment hearing, the Bears filed a motion to dismiss the petition, which was denied. (N.T. 19-31.) They argued Dauphin County MH/MR did not have standing to bring an involuntary commitment under MH/MR Act, section 406 because Steven had been adjudicated incapacitated, and Dauphin County MH/MR was not Steven's legal guardian. 50 P.S. §4406. They argued that Dauphin County MH/MR was in effect, asking this court to "override the guardianship decreed by the Snyder County court." (Motion to dismiss ¶15.) The decree had granted them authority and responsibility to decide where Steven lived and how his meals, personal care, transportation and recreation would be provided.

Dauphin County MH/MR responded that regardless of the decree, the Bears had no authority to designate where Steven lives. First, the Guardianship Act expressly provides that a guardian's authority is specifically limited and controlled by other statutes, including, but not limited to, the power to admit an incapacitated person to a state center for the mentally retarded. 20 Pa.C.S. §5521(f). This provision limits the more general power set forth in the Guardianship Act, that the guardian has power to designate the place for the incapacitated person to live. See 20 Pa.C.S. §5512.1. They note the same day section 5521(f) was adopted, a provision was also included in the MH/MR Act limiting the power of the

form, is questionable, but not at issue here inasmuch as they have a statutory mandate to advocate for the mentally retarded. (Exhibit I-12; N.T. 169-71.)

guardian to provide substitute consent for placement at state institutions only of their minor-wards. 50 P.S. §4402(a)(2).

We agree that the guardianship decree is valid to the extent permissible under the Guardianship Act but it cannot create greater authority than statutorily permitted. Under section 406, a petition for involuntary commitment of a mentally retarded citizen may be filed by "a relative, guardian, friend, individual standing on loco parentis or by the executive officer or an authorized agent of a governmental or recognized nonprofit health and welfare organization or agency or any responsible person." 50 P.S. §4406(a)(1). The commitment petition here was filed by Dauphin County MH/MR case manager and MR case management state center coordinator Luana K. Brown, clearly an authorized petitioner under this statute. Accordingly, Dauphin County MH/MR had standing to file the commitment petition in this case.

### Proper Forum—DPW Waiver Hearing or Section 406 Commitment

The Bears argued that the failure of Dauphin County MH/MR to hold an administrative hearing before a DPW hearing officer violated their right to a fair hearing under the federal waiver program. 42 U.S.C. §1396n(c). However, we conclude the DPW fair hearing process was never implicated since the community-based placement identified for Steven is not funded under the federal waiver program.

The Medicaid program, established by title XIX of the Social Security Act, provides federal financial assis-

tance to states that choose to reimburse certain costs of medical treatment for needy persons, the aged, the blind and the disabled. 42 U.S.C. §1396-1396v. Pennsylvania participates through section 442.1 of the Public Welfare Code. 62 P.S. §§101-1411. The federal government shares the costs for such care with states that participate and, in return, participating states must comply with requirements imposed by the Act and by the secretary of the United States Department of Health and Human Services.

In Pennsylvania, the Medicaid program, called the medical assistance program, is administered by DPW. The waiver program at issue "permits states to offer, under a waiver of statutory requirements, an array of home and community-based services that an individual needs to avoid institutionalization." 42 C.F.R. §441.300. See 42 U.S.C. §1396n(c). The program name contains the reference to "waiver" because the government waives certain regulations for community-based programs under which intermediate care facilities for the mentally retarded, including state centers or private facilities, are required to operate. Both Selinsgrove Center and AVS are considered providers of ICF/MR. (N.T. 85.) Though state and federally funded, each county administrator's MH/MR office has responsibility to implement the waiver program and establish placement guidelines.

The federal statute establishing the waiver program contains the following "freedom of choice" provision:

"(2) A waiver shall not be granted under this subsection unless the state provides assurances satisfactory to the secretary that—

"(C) Such individuals who are determined to be likely to require the level of care provided in a hospital, nurs-

ing facility, or intermediate care facility for the mentally retarded are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of inpatient hospital services, nursing facility services, or services in an intermediate care facility for the mentally retarded." 42 U.S.C. §1396n(c)(2)(C).

The federal regulations specifically delineate that the recipient's legal representatives have the right to reject a transfer from institutional care to community-based care, as follows:

"Assurance that when a recipient is determined to be likely to require the level of care provided in an ICF/MR, *the recipient or his or her legal representative* will be—

"(1) Informed of any feasible alternatives available under the waiver; and

"(2) *Given the choice of either institutional or home and community-based services.*" 42 C.F.R. §435.302(d). (emphasis added)

Under Pennsylvania regulations, a DPW hearing is required when "the individual or legal representative is denied their service preference of waiver-funded services or ICF/MR." (Motion to dismiss, exhibit E.)

Because the Bears believed Dauphin County MH/MR was attempting to move Steven to community-based housing under the waiver program, they logically assumed that as Steven's legal representatives, they had the right to choose between Selinsgrove or the waiver-funded program. In light of the fact Dauphin County MH/MR was not adhering to their choice, they requested a

DPW hearing under the waiver program. Ultimately, however, Dauphin County MH/MR chose a community-based home which was not funded by the waiver program but solely with state funds.[8] (N.T. 119-20, 154; affidavit Eloise Myers.)

## II. *Commitment Issues*

The Bears argue that as guardians, they have authority to decide whether their son lives in the Selinsgrove Center or in a community-based home. Dauphin County MH/MR responds that the Bears have no such authority. It maintains that the court must commit Steven to the community-based home since it provides him with the least restrictive alternative as required under the law.

The Bears apparently concede that any authority they have to choose where Steven lives arises from their status as guardians and not as parents.[9] 50 P.S. §4402. Thus,

---

8. The record does not disclose if the decision to choose the home, operated by AVS, was made to divest the Bears of their right to make the choice between Selinsgrove Center and the proposed community-based home.

9. Originally, the Bears had, in their parental capacity, authority under the Mental Health Act of 1951 to voluntarily admit their minor son to Selinsgrove Center. That admission authorized Steven's commitment until his 18th birthday, March 6, 1970, at which point their parental right to substitute their consent lapsed. 50 P.S. §4402. While it is beyond question that both the state and federal constitutions protect a parent's right to make important decisions for and on behalf of their minor children, see *e.g., Green Appeal,* 448 Pa. 338, 292 A.2d 387 (1972); *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493 (1979), those rights are not guaranteed to parents of noncompetent adult children. See *e.g., Cruzan v. Director, Missouri Department of Health,* 497 U.S. 261, 110 S.Ct. 2841 (1990).

the Bears maintain they have not only the authority, but the duty, under the guardianship statute, to assert the rights and best interests of their son, which they maintain requires that he remain at the Selinsgrove Center. It is uncontested the Bears passionately believe this will serve Steven's best interests. (N.T. 127, 142, 149, 163, 175, 182, 190, 197, 210.)

Section 5521 of the Guardianship Act defines a guardian's duties as follows:

"(a) Duty of guardian of the person.—It shall be the duty of the guardian of the person to assert the rights and best interests of the incapacitated person. Expressed wishes and preferences of the incapacitated person shall be respected to the greatest possible extent. Where appropriate, the guardian shall assure and participate in the development of a plan of supportive services to meet the person's needs, which explains how services will be obtained. The guardian shall also encourage the incapacitated person to participate to the maximum extent of his abilities in all decisions which affect him, to act on his own behalf whenever he is able to do so and to develop or regain, to the maximum extent possible, his capacity to manage his personal affairs." 20 Pa.C.S. §5521(a).

The Bears also cite the Snyder County guardianship decree as providing them with authority to decide where Steven shall live, which, as discussed *supra*, cannot create greater authority than statutorily permitted.

Thus, we must measure the guardians' position of what is in their ward's best interests against Dauphin County MH/MR's perceived mandate to involuntary commit him to the least restrictive living alternative. Ideally, these

standards when applied would yield the same result since life in a less restrictive setting would generally be in the best interests of a mentally retarded person. See *In re Frederick F.,* 400 Pa. Super. 542, 548, 583 A.2d 1248, 1251 (1990). However, this case is unique since the allegedly more restrictive setting is Steven's established home of 44 years.

## Need for Commitment

Steven was originally placed in Selinsgrove Center when widespread institutionalization of mentally retarded citizens was the rule. However, such institutionalization has decreased dramatically over the last 30 years and has been and is being replaced by community-based residential and vocational programs under state and federal policies known, respectively, as "normalization" and "integration."[10] Pennsylvania law reflects the movement to community living as set forth by our Supreme Court in *In re Schmidt,* 494 Pa. 86, 429 A.2d 631 (1981). The court explained normalization as follows:

"The concept of normalization envisions that the mentally retarded person and his or her family shall have the right to live a life as close as possible to that which is typical for the general population. *Consistent with this concept is the requirement that the least restriction consistent with adequate treatment and required care shall be employed.*" *Id.* at 96, 429 A.2d at 636. (empha-

---

10. The number of mentally retarded Pennsylvanians in institutions decreased from 13,470 in 1966 to 2,478 by June 1998. (Exhibit I-1, pp. 8-9.) The number of Dauphin County residents in state facilities dropped from 256 in 1974 to 16 in 1999. (N.T. 116.)

sis added) The state regulations also address normalization and require that counties which administer mental retardation services be responsible for "maximum normalization of mentally retarded citizens." 55 Pa. Code §6201.11.[11]

Similarly, it is federal policy that persons with mental retardation have a right to appropriate treatment, services and habilitation "in the setting that is least restrictive of the person's personal liberty" and it is the national goal that they achieve "full integration and inclusion in society, in an individualized manner, consistent with unique strengths, resources, priorities, concerns, abilities and capabilities of each individual." 42 U.S.C. §6009(1) and (2), §6000(a)(10) (Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. §6000 et seq.). In fact, title II of the Americans With Disabilities Act prohibits disability-based discrimination by state and local governments and their agencies. 42 U.S.C. §12132. The implementing regulations accompanying this statute, referred to as the integration mandate, require that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. §35.130(d).

In seeking to implement this policy, Dauphin County MH/MR sought Steven's involuntary commitment to the community group home under MH/MR Act, section 406.[12] Although this section was ruled void for vague-

11. The Guardianship Act also specifically mandates that "the least restrictive alternative" be provided to incapacitated persons requiring guardianship appointment. 20 Pa.C.S. §5502 (1992).

12. Section 406 provides as follows:

"(a) whenever a person is believed to be mentally disabled, and in need of care or treatment by reason of such mental disability, and ex-

ness,[13] state regulations drafted in response thereto corrected the constitutional deficiency. Thus, the controlling regulations provide as follows:

amination of such person has been made by a physician or physicians, or for any reason the examination of such person cannot be made, a petition may be presented to the court of common pleas of the county in which a person resides or is, for his immediate examination or commitment to an appropriate facility for examination, observation and diagnosis.

"(1) The petition may be made by a relative, guardian, friend, individual standing in loco parentis or by the executive officer or an authorized agent of a governmental or recognized nonprofit health and welfare organization or agency or any responsible person.

"(2) The petition shall set forth the facts upon which the petitioner bases his belief of mental disability and the efforts made to secure examination of the person by a physician.

"(3) Said court upon consideration of such petition shall: (i) issue a warrant requiring that such person be brought before said court; (ii) fix a date for a hearing which shall be as soon as the warrant is executed, and (iii) notify the parties in interest.

"(4) After hearing, said court may: (i) order an immediate examination by two physicians appointed by said court, or (ii) order the commitment of the person believed to be mentally disabled, to a facility for a period not exceeding 10 days for the purpose of examination. If the examination can be accomplished by partial hospitalization, said court may so direct.

"(b) If, upon examination, it is determined that such person is in need of care at a facility, the examining physicians or director, as the case may be, shall immediately report to said court which may order the commitment of such person for care and treatment.

"In its order of commitment, said court may permit partial hospitalization or outpatient care, or if at any time thereafter the director shall determine such partial hospitalization or outpatient care to be beneficial to the person so committed, the same may be permitted by said court upon application by the director." 50 P.S. §4406.

13. *Goldy v. Beal,* 429 F. Supp. 640, 649 (M.D. Pa. 1976). While the court enjoined the use of section 406 for commitment to state fa-

"A person shall be determined to be a mentally retarded person in need of residency placement only upon the following findings:

"(1) The person is impaired in adaptive behavior to a significant degree and is functioning at an intellectual level two standard deviation measurements below the norm as determined by acceptable psychological testing techniques.

"(2) The impairment and the resultant disability were manifested before the person's 18th birthday and are likely to continue for an indefinite period.

"(3) The person, because of his retardation, presents a substantial risk of physical injury to himself or physical debilitation as demonstrated by behavior within 30 days of the petition which shows that he is unable to provide for, and is not providing for his most basic need for nourishment, personal and medical care, shelter, self-protection and safety, and that provision for such needs is not available and cannot be developed or provided in his own home or in his own community without residential placement." 55 Pa. Code §6250-11. (emphasis added)

These standards were adopted by the Supreme Court in *In re Schmidt, supra.* See also, *In re Frederick F., supra.*

It is uncontested Steven is in need of residency placement under these standards. (N.T. 80-81.) What is hotly contested is whether his residency placement should be

cilities on grounds of vagueness, it stayed its injunction and permitted the continued use of section 406 subject to the correcting regulations.

at Selinsgrove Center or in the AVS community-based home.[14]

Dauphin County MH/MR argues that this court does not have a choice of placements under the law. They argue that because its team of professionals has concluded Steven would benefit from community-based care and that such care is available, he is not eligible for state institutional placement since the community-based home will provide him with a less restrictive alternative, which is mandated under the law. (N.T. 153, 157, 160.)

Dauphin County MH/MR argues Steven's current Selinsgrove placement is illegal. They note that the Bears' original statutory authority to voluntarily admit Steven there lapsed upon Steven becoming an adult. Thereafter, his Selinsgrove residency was apparently presumed voluntary, although Steven's consent was never secured and the right of his parents to substitute their consent lapsed.

14. Although we think the regulation is somewhat unclear, we believe the regulatory term "residency placement" includes facilities identified as "residential" elsewhere in the DPW regulations, including ICF/MRs, family living homes and community homes for individuals with mental retardation. See 55 Pa. Code §6400 et seq. (N.T. 85 AVS describes itself as generally an ICF provider.) Compare *In re Frederick F., supra,* where the Superior Court equated "residency placement" with state institutionalization under the facts. There, the lower court denied the county MH/MR's petition seeking the involuntary commitment of a mentally retarded juvenile to a state institution under section 406, finding such placement too restrictive. The Superior Court affirmed and rejected the argument that a 406 commitment does not necessarily include only institutionalization. The court noted that notwithstanding that Regulation 6250.11(3) does not specifically refer to institutionalization, under the facts of the case, it meant just that, since no community residential alternative had been offered by the MH/MR office. *Id.* at 550, 583 A.2d at 1252.

50 P.S. §4402. Thus, Dauphin County MH/MR argues that when the Bears had Steven adjudicated "a totally incapacitated person" in Snyder County, the fiction of his voluntariness was revealed and it was *forced* to file a commitment petition because the presumption Steven consented to Selinsgrove residency was voided by the incapacity adjudication.[15] Since adult residents of state centers must either be there voluntarily or involuntarily (as the result of a court order), and Steven had been adjudicated incapacitated, he could not be there voluntarily. Thus, it argues that the only means to regularize his status was to file an involuntary commitment petition.

Dauphin County MH/MR also points out that statutory authority to make discharge and placement decisions is solely vested by law in the facility director and county. 50 P.S. §§4419, 4420, 4416. Since the law requires placement in the least restrictive alternative, they argue they have no choice but to petition for his placement in the only viable placement choice—a community-based home.

We disagree. The fiction in the MH/MR argument is that it assumes Steven's 44 years of residency at Selinsgrove Center are completely irrelevant to our inquiry; that this court should decide Steven's residency place-

---

15. We doubt that Dauphin County MH/MR filed its petition solely because the fiction of Steven's capacity to consent to a voluntary commitment only revealed itself when the Bears had Steven adjudicated incapacitated. Recognition of his incapacity had been earlier revealed in 1987 when a plenary guardian of the estate was appointed for him. His IQ of between 6 and 14 and physical condition have been known by Dauphin County MH/MR for decades.

ment as if making an initial placement decision between a state center and a community-based home. Certainly under both state and federal law, Steven is entitled to live in an environment that is the least restrictive alternative available. However, we do not interpret the law to mandate his transfer under the circumstances presented. Instead, we hold that the law indicates a preference for the least restrictive alternative, not a mandate.

Helpful in our inquiry is a recent decision by the United States Supreme Court in *Olmstead v. L.C.,* 119 S.Ct. 2176 (1999). There, two mentally retarded persons sought to compel the state to remove them from an institution to a community-based residential setting. They alleged the state's failure to place them in community-based programs, once their treating professionals determined such placements were appropriate, violated their legal rights. Madam Justice Ginsburg on behalf of the court concluded that under title II of the ADA, states must provide community-based treatment for persons with mental disabilities "when the state's treatment professionals determine that such placement is appropriate, *the transfer from institutional care to a less restrictive setting is not opposed by the affected individual,* and the placement can be reasonably accommodated, taking into account the resources available to the state and the needs of others with mental disabilities." *Id.* at 2181. (emphasis added) While the individuals in that case sought to require the state to provide them with community-based treatment, the court noted as follows:

"We emphasize that *nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from com-*

*munity settings.* . . . Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it." *Id.* at 2187-88 (citing 28 C.F.R. §35.130(e)(1)). (emphasis added)

Thus, *Olmstead,* importantly, recognizes an element of choice between an existing institutional placement and a proposed transfer to a community-based treatment facility. But see *Richard C. v. Houstoun,* no. 89-2038 at 10 (Sept. 29, 1999 W.D. Pa.) (court rejected argument that institutionalization is required if any of the three *Olmstead* criteria are not met; *i.e.,* treatment professionals determine placement is inappropriate, the affected person opposes the treatment or the state cannot reasonably accommodate the placement due to resource issues).[16] The right to refuse transfer from a state institution to a proposed community placement is also provided under the federal waiver program, discussed earlier. The choice in that situation belongs not only to the mentally retarded individual but also to his or her legal representative. 42 C.F.R. §435.302(d).

There is no similar state regulation specifically precluding the state (or its agencies) from imposing community-based treatment on patients who do not desire it.

---

16. In that action, family representatives of a class of Western Center residents sought to intervene in an action to stay the outplacement of their family members to community-based residences. The outplacement had been part of a 1992 settlement agreement reached between DPW, the residents and their family representatives. The family applicants sought the stay pending cessation of alleged violation of the agreement and federal law. The court concluded the family applicants had failed to provide a basis for intervention under *Olmstead.*

However, we agree, as the Bears argue, that section 406 and its regulations were probably not written with the idea of transfer in mind but rather initial placement. Nevertheless, we do not find in the state law a mandate that requires us to *transfer* a mentally retarded individual from a state institution to a community-based home. Thus, we conclude state law does not preclude a mentally retarded person from making a choice of proposed placement alternatives where one viable alternative is *remaining* in an institutional setting where his needs have been appropriately and satisfactorily met for almost his entire lifetime.

In this case, Steven is totally incapacitated and has no ability to communicate a conscious, informed and intelligent decision as to his preference.[17] We believe, in such a case, this decision necessarily rests with the court under its authority to order the involuntary commitment of persons to an appropriate facility. 50 P.S. §4406(b). Under the facts presented at the commitment hearing, it is our conclusion that the most appropriate placement for Steven is at Selinsgrove Center.

## Most Appropriate Placement

We hold Selinsgrove Center to be the most appropriate placement based upon our findings that Steven is happy at Selinsgrove Center and he considers it his home and the staff and residents his family; that the stress and disruption a transfer may cause is too great a risk; and

---

17. Complicating matters is that the guardians' position is opposed by Steven's public defender and his "advocate," PP&A.

that the alleged advantages of the AVS home and the disadvantages of Selinsgrove Center, cited by Dauphin County MH/MR, are not substantial and, in fact, the two sites are comparable in many respects.

Initially, we note that the testimony firmly established that both Selinsgrove Center and the AVS home will address Steven's basic needs appropriately and satisfactorily. (N.T. 82, 130, 146, 179, 203, 212, 230 (Selinsgrove Center); 74, 80-81 90-100, 130 (AVS home).) Thus, first we base our decision on the fact that Selinsgrove Center is Steven's home and that he has developed relationships there. According to his mother, Steven is happy at Selinsgrove Center. (N.T. 219.) Furthermore, according to Selinsgrove Center residential service worker Anthony Buoy, Steven considers Selinsgrove Center his home and the staff his family members. (N.T. 135.) Mr. Buoy has known Steven for 21 years and has worked directly with him for seven. (N.T. 126-27.) The Bears lauded the Selinsgrove Center staff, noting they were warm and cautious with Steven and provided him companionship. (N.T. 205, 213.) Steven also receives quite a bit of individual attention from staff and has access to and actively seeks out his "foster grandparents," with whom he has quite a long relationship. (N.T. 66-67, 130, 132, 184.) Mr. Bear described Steven's care there as excellent, noting Steven is always clean and progressing, and has never been neglected. (N.T. 203, 208.) Mrs. Bear testified Selinsgrove Center had accomplished things with Steven that she had been unable to do in the three years he lived with her and her husband. (N.T. 212.)

Although conflicting, the testimony indicated that a transfer has the potential to be unduly stressful and dis-

ruptive to Steven. Dauphin County MH/MR's expert psychologist, Dr. G. David Smith, acknowledged that a move from an institution will cause significant changes in Steven's behavior. (N.T. 73.) In fact, Steven is wedded to his Selinsgrove Center routine, and if disrupted, he becomes angry and develops a fixed stare from which it is difficult to distract him. (N.T. 76, 134.) However, Dr. Smith noted that he has known of one woman who made a successful transition after 60 years of institutional care and of others with Steven's degree of disability who also made successful transitions.[18] (N.T. 79.) DPW's Rita Zimmerman, testifying on behalf of Dauphin County MH/MR, acknowledged that many families initially fear such moves; however, transition can be successfully accomplished by approaching each case flexibly and individually. (N.T. 161-62.) However, Selinsgrove Center staff who care for Steven indicated concern about uprooting him from his home and the possible negative effects it would have upon him. (N.T. 134-35, 184-85, 199, 229.) Selinsgrove Center psychologist Dr. Bruce Moyer testified that moving long-term patients from their environments can dramatically increase their mortality, and one Selinsgrove staff member expressed specific concern such an effect would occur with Steven. (N.T. 185, 229.) Anthony Buoy testified he was concerned about such a move after such a long placement, even though he believed Steven might be okay in the long-term. (N.T. 134-35.) Residential services supervisor Ronald Bowersox also

---

18. Dr. Smith did not indicate the woman's degree of disability nor how many years those with similar disabilities to Steven's had been institutionalized.

expressed concerns with the move particularly because Steven's parents were not supporting it. (N.T. 199.) Ultimately, the effect such a move would have upon Steven is, of course, unknown and this court cannot ignore that Steven has apparently thrived at Selinsgrove Center for 44 years.

We were also unconvinced that the advantages of the AVS home are as substantial as purported by Dauphin County MH/MR. AVS program director Christine Smith described the programs offered at the two sites as "extremely comparable." (N.T. 112-13.) Anthony Buoy also indicated the two sites offered comparable services. (N.T. 130.)

At Selinsgrove Center, Steven lives with approximately 20 other residents with similar disabilities in a residential wing.[19] (N.T. 44, 135.) After waking up, Steven is assisted with dressing and tube feeding. He then participates in basic skill training, physical therapy including walking with a walker. (N.T. 69, 129.) After lunch (tube feeding) with other residents, he has more structured programs including, for example, speech or music therapy. (N.T. 69-70.) He is then free to move about and will seek out his foster grandparents or staff or listen to music, after which he takes a nap while other residents attend dinner. (N.T. 69, 176, 183.) After his nap, he attends a scheduled evening activity including dances and music events. (N.T. 143, 183.) Steven returns to his room and is in bed by 8:30 or 9 p.m. (N.T. 184.) In addition to his daily routine, Selinsgrove Center offers field

---

19. Selinsgrove Center houses approximately 560 residents.

activities several times a week, off-ground outings once a month and, weather permitting, an outside picnic once a week. (N.T. 68, 132.) Steven looks forward to his outside excursions. (N.T. 70.)

The AVS home is a one-story ranch home in a residential neighborhood. It will house two other residents in addition to Steven, each with a separate bedroom. Either one or two staff will be on the premises at all times. (N.T. 74.) From 9 a.m. to 2:30 p.m. each weekday, the residents will be transferred to the AVS day center in nearby Hummelstown. That site offers two prevocational training areas and three developmental areas, all of which work on social development. (N.T. 99.) All residents are assigned three goals. The prevocational program, geared toward job skill training, would be irrelevant to Steven. The developmental training is intended to assist individuals to work on basic cognitive skills. (N.T. 99-100.) These programs are comparable to those afforded Steven at Selinsgrove Center, except the AVS home carries a three-goal plan and Selinsgrove carries five or more. (N.T. 130.) The morning AVS program involves working on two goals and after lunch, participation in a large group activity. (N.T. 111.) During the summer, the residents have access to an outdoor pavilion. (N.T. 111.) Evening activities include mall visits, movies and Hersheypark visits. (N.T. 97.)

Dr. Smith, on behalf of MH/MR, testified that Selinsgrove Center was not the most suitable placement for Steven. He opined that Steven has a "significant capacity for growth and development" beyond his current level and that Steven would exhibit positive behavioral changes at the AVS home. He testified that an increased

staff-to-resident ratio in the AVS placement would increase individual attention and allow staff to appreciate each resident's subtle skills. He criticized institutional care generally as requiring conformity which in turn fosters dependence. For example, he noted that although Steven was capable of retrieving a bib and wiping his mouth, he waited for Selinsgrove Center staff to perform this for him. (N.T. 74-77.)

We are unconvinced this evidence established the AVS home superior to Selinsgrove Center. Except for noting that Steven could have learned to wipe his own mouth, Dr. Smith offered no specific testimony as to the type of growth and development or positive behavioral changes Steven could achieve at the AVS school. Furthermore, although Dr. Smith stressed that Steven would receive greater attention in the AVS home, he nevertheless described Selinsgrove Center as so nurturing and supportive that it fosters laziness. (N.T. 77.)

## Least Restrictive Alternative

Even if state law mandates placement in the least restrictive alternative setting, the Bears present the unique argument that the community-based home is not less restrictive than Selinsgrove Center. We have found no case where parties contested the meaning of "least restrictive alternative."[20] Rather, the assumption has been that com-

---

20. The cases most relevant to this one involve situations where the person to be involuntarily committed seeks placement in a less restrictive setting than that proposed. See *In re Schmidt; In re Frederick F.,* *supra* (applying state law); *Olmstead v. L.C., supra* (applying federal law).

munity-based housing is less restrictive than an institution. However, the Bears have presented evidence in support of their argument that the AVS home may be neither less restrictive nor a viable alternative to Selinsgrove Center.

The evidence revealed that Steven's predominant characteristic is that he enjoys people and loves to move around his environment to meet them. At Selinsgrove Center, Steven is free to and does move around a lot within his wing and also to numerous institutional wings including into the patio, living area and auditorium. (N.T. 68, 131, 228.) He knows his way around the labyrinth of institutional hallways, even moving some 500 to 600 feet to get a haircut or go to the dentist. (N.T. 68, 131.) If transferred, he would require transportation to travel anywhere.[21] (N.T. 209.) His mother testified that he is deathly afraid of ramps. (N.T. 218.) Dr. Moyer testified that transfer would cause Steven a loss of independence whereby, when he is at the day center, he would need increased supervision to move around. (N.T. 228.) Transfer to the group home would restrict Steven in this context. Also, he would reside in a much smaller environment with only two other residents and two staff. Thus, he would be physically restricted to a small ranch home and socially restricted to his two fellow residents and two staff, who change over every eight-hour shift. For a person with a gregarious social nature such as Steven,

---

21. In addition, although the testimony did not address it, we note the exhaustion factor which is true of an individual such as Steven who must be appropriately outfitted for his daily van ride to the AVS day center.

this can clearly be viewed as more restrictive. (N.T. 136, 209.)

The Bears also argue that the AVS community-based home is not a viable or relevant alternative to achieve Steven's "normalization." "[N]ormalization envisions that the mentally retarded person . . . live a life as close as possible to that which is typical for the general population." *In re Schmidt* at 96, 429 A.2d at 636. Based upon Steven's mental and physical condition, it is uncontroverted he will never learn a job skill, access a bus at his home, go shopping or be self-supporting. He will never be able to care for his basic needs without 24-hour trained medical assistance for his feedings and personal hygiene. He will never be able to speak in the traditional manner as other adults. In sum, he will never live a life close to that of the general population.

Ms. Smith, AVS program director, testified that Steven and his housemates would be encouraged to assist with mealtime preparation and would participate in such activities as playing board games on the patio. (N.T. 97.) Steven, however, has an IQ of 6-14, mental age of 10 months, limited use of his hands and cannot eat.[22] These available activities, therefore, are irrelevant to Steven's "lifestyle," and possibly, therefore, not viable in the sense of accomplishing normalization. Dr. Smith essentially confirmed this during his testimony, stating that the issue of where a person with Steven's degree of disability ultimately lives "isn't really the institution versus the

---

22. The suggestion that Steven could, in lieu of assisting with mealtime preparation, assist measuring the amount of feeding he would receive when hooked up to his gastronomy tube, is unrealistic.

community. It's the availability of the support that person needs." (N.T. 79.) As we have discussed earlier, the support offered at Selinsgrove Center meets Steven's needs admirably.

Furthermore, in deciding between the two placements, this court cannot ignore that one has been his home for nearly all his life. See *Olmstead* at 2189 ("Each disabled person is entitled to treatment in the most integrated setting possible for that person—recognizing that, on a case-by-case basis, that setting may be in an institution." *Youngberg v. Romeo,* 457 U.S. 307, 327 (1982) (Blackmun, J., concurring); "For many mentally retarded people, the difference between the capacity to do things for themselves within an institution and total dependence on the institution for all of their needs is as much liberty as they ever will know."). Surely the goal of the executive and legislative branches in drafting and implementing "normalization" statutes and regulations also encompassed "quality of life." The goal of any civilized society must be to provide the best quality of life reasonably possible for its citizens with impoverished minds and bodies. This court asks what would it do to the quality of life of a profoundly retarded man, physically disabled as well, to remove him from his home of 44 years, from what little joys of life he has living in the comfort of his surroundings, cared for by people who know and love him and provide for his every need? Surely, justice demands we allow him the dignity not to disrupt and uproot him from this. Accordingly, we find Dauphin County MH/MR has not proven the AVS home is a less restrictive alternative under the facts.

## Conclusion

Accordingly, I find as a matter of law that moving Steven Bear, a mentally retarded citizen, to the purported less restrictive environment is not mandated under the circumstances presented and that the most appropriate placement for him is in Selinsgrove Center. Alternatively, I find the evidence did not support the proposition that the group home is, in fact, a less restrictive alternative to Selinsgrove Center, given Steven's unique strengths, likes, dislikes, abilities, capabilities and well-being.

## ORDER

And now, December 2, 1999, upon consideration of the petition to involuntarily commit Steven D. Bear, pursuant to section 406 of the MH/MR Act of 1966, 50 P.S. §4406, this court hereby holds that Steven D. Bear is a mentally retarded person in need of residency placement and that the appropriate placement shall continue to be at Selinsgrove State Center.