**In re Ruth EASLY.**

**Appeal of Nancy R. Thaler, Deputy Secretary of Mental Retardation, Commonwealth Department of Public Welfare, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Nov. 1, 2000.

Decided Feb. 26, 2001.

Howard Ulan, Harrisburg, for appellant.

Vincent A. Coppola, Pittsburgh, for appellee.

Before DOYLE, President Judge, McGINLEY, SMITH, PELLEGRINI, FRIEDMAN, KELLEY and FLAHERTY, Judges.

KELLEY, Judge.

Nancy Thaler, Deputy Secretary of Mental Retardation (Secretary), Department of Public Welfare (Department), appeals from a May 8, 2000 order of the Court of Common Pleas of Venango County (trial court) denying her motion for post trial relief from the trial court's April 12, 2000 order. The April 12, 2000 order granted the Secretary's Petition for Mental Retardation Commitment (Petition), committed Ruth Easly to Polk Center pursuant to Section 406 of the Mental Health Mental Retardation Act of 1966 (MH/MR Act of 1966),[1] and imposed restrictions upon any future removal of Ms. Easly from Polk Center.[2]

## I. FACTS AND PROCEDURAL HISTORY

The facts and procedural history of this matter, as found by the trial court, are as follows. Ms. Easly was born on December 2, 1927. Until her admission in 1942 at the age of fourteen to Polk Center, Ms. Easly resided with her family in Hastings, Cambria County, Pennsylvania.[3] Although Ms. Easly is seventy-two years old, she functions within the profound range of mental retardation as a result of a mechanical injury at birth. Ms. Easly has a communication age equivalent to one year, ten months, and daily living skills equivalent to two years, eight months. She has a socialization age of one year, six months, and a mental age of two years, one month, with an IQ of fourteen. Ms. Easly can walk but suffers from debilitating medical problems such as hiatel hernia, which causes her chest pains, hypercholesterolemia, scalp seborrhea and asteorosis. Ms. Easly is on medication, including carafte, skin lotion and mevacor, for her hypercholesterolemia.

Ms. Easly is accurately described as very small in stature, very unassuming and a very quiet person. When with a group of people, she likes to remain on the periphery and watch. She is fully ambulatory and has the capacity to communicate verbally. Ms. Easly enjoys looking at the

---

1. Act of October 20, 1966, Special Sess., P.L. 96, *as amended*, 50 P.S. § 4406. We note that Section 502 of the Mental Health Procedures Act, Act of July 9, 1976, P.L. 817, 50 P.S. § 7502, repealed Sections 102, 401–413, 416, 418–420 and 426 of the MH/MR Act of 1966, 50 P.S. §§ 4102, 4401–4413, 4416, 4418–4420, and 4426, except insofar as these Sections relate to mental retardation or to persons who are mentally retarded.

2. While the trial court's order grants the Secretary's Petition and commits Ms. Easly to Polk Center, the Secretary was not seeking an order committing Ms. Easly to Polk Center. Instead, the Secretary filed the Petition seeking a commitment order for Ms. Easly's care at Cambrian Hills, a licensed group home also known as a community based facility, located in Cambria County.

3. Polk Center is located in Venango County, Pennsylvania.

pictures in magazines, watching television, and going to church.

No court proceeding was initiated to place Ms. Easly at Polk Center. When she was committed at age fourteen, her parents would have had the authority to commit her as a voluntary commitment. In 1998, Stephen Dvorchak, Ms. Easly's nephew, petitioned the trial court to be appointed plenary guardian of the person and estate of Ms. Easly. On July 6, 1998, the trial court, after a hearing, concluded that Ms. Easly was incapacitated and that a plenary guardian of her person and estate should be appointed. As a result, Mr. Dvorchak was appointed as plenary guardian.

The Department, pursuant to its plan for compliance with Part A of Title II of the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. §§ 12131–12134,[4] began out processing from institutional settings, such as Polk Center, patients who the health care professionals determined could function in a community setting. The professional staff at Polk Center, as part of a team, concluded that Ms. Easly could function appropriately in a community group home, and began planning for her removal to a community group home. Thereafter, the professional staff at Polk Center, Cambria County Mental Health/Mental Retardation (Cambria County MH/MR) administration and the Cambrian Hills Center (a community based residential facility), collectively determined that community placement in Cambria County would be in Ms. Easly's best interest because Ms. Easly had originally come from Cambria County. Dialogue was opened with Ms. Easly's family; however, the family opposed Ms. Easly being removed from Polk Center.

Cambrian Hills is located in Portage, Cambria County, Pennsylvania and is owned and operated by Northwestern Human Services of Pennsylvania. Pursuant to Section 419 of the MH/MR Act, 50 P.S. § 4419, the facility director at Polk Center authorized a leave for Ms. Easly from Polk Center to Cambrian Hills Center as a trial visit.[5] Ms. Easly first visited the facility in Cambria County in May 1998. Ms. Easly visited again in the summer and fall of 1998 and had her first overnight trip on December 28 and 29 of 1998. Ms. Easly was then transferred to Cambrian Hills beginning February 9, 1999. The Secretary contends that the trial visit was successful and the plan was to discharge Ms. Easly from Polk Center; however, the discharge was delayed temporarily to permit continued prescription services through Polk Center.

Mr. Dvorchak, as Ms. Easly's guardian, vigorously opposed Ms. Easly's placement at Cambrian Hills and threatened litiga-

4. The anti-discrimination provision contained in the public services portion or Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

5. Section 419 of the MH/MR Act of 1966 authorizes a facility director to permit a leave of absence for any person admitted or committed whose condition is such as to warrant the action, for a period not exceeding one year. The director may renew or extend a leave of absence for an additional period or periods not exceeding one year to each such renewal or extension. The director may terminate a leave of absence and, if necessary, authorize the apprehension and return of the person to whom the leave was granted by any police authority. Whenever a leave of absence is granted or extended to a period of three years without the leave being terminated by the director, the person admitted or committed shall be deemed to be discharged upon the expiration of the three-year period.

tion. Cambria County, through its mental health/mental retardation service unit, concluded that there were issues concerning whether Ms. Easly had been improperly placed at Cambrian Hills and at Mr. Dvorchak's insistence, returned Ms. Easly from the group home in Cambria County to Polk Center on May 18, 1999, where she now resides.

On May 24, 1999, the Secretary filed a Petition for Mental Retardation Commitment with this Court, requesting that we exercise original jurisdiction and issue a commitment order for Ms. Easly's care at Cambrian Hills "so as to permit her to there reside in peace without fear of precipitous, unauthorized relocation such as she recently suffered." Reproduced Record (R.R.) at 10a. Mr. Dvorchak, as guardian, filed preliminary objections challenging venue and jurisdiction. On June 8, 1999, this Court entered an order transferring the matter to the trial court.

Upon transfer, the trial court appointed Virginia Sharp, Esquire, as guardian ad litem for Ms. Easly. At a pre-hearing conference, the parties agreed that the trial court would be required to determine whether the Department is required, when it changes the placement of a person such as Ms. Easly, from Polk Center to a community facility, to use administrative pro-

cedure and afford the family or guardian a hearing under Title 55 of the Pennsylvania Code.

Hearings before the trial court were scheduled for August 23 and 24, 1999. Upon the conclusion of the hearings, the trial court, with agreement of all parties, visited Ms. Easly at Polk Center on August 26, 1999. The trial court's observations were memorialized in a memorandum and submitted into evidence as court exhibit 2.

After the trial court's visit with Ms. Easly at Polk Center, the trial court reopened the record, at the request of counsel for Mr. Dvorchak, and the court received additional testimony on September 14, 1999. During the course of the hearings, the trial court received testimony from eight witnesses called by the Secretary and ten witnesses called by the guardian. The trial court also considered five exhibits submitted by the Secretary, seven exhibits submitted by Mr. Dvorchak as the guardian, two exhibits submitted by Attorney Sharp as the guardian ad litem, and three court exhibits.[6]

In rendering its decision, the trial court first determined that Section 406 of the MH/MR Act of 1966 provides a proper vehicle to dispose of the issues presented.[7]

6. The trial court also received the collective bargaining agreement relating to employees at Cambrian Hills, which the court included in the record.

7. Section 406 of the MH/MR Act of 1966, entitled civil court commitment, provides as follows:

(a) Whenever a person is believed to be mentally disabled, and in need of care or treatment by reason of such mental disability, and examination of such person has been made by a physician or physicians, or for any reason the examination of such person cannot be made, a petition may be presented to the court of common pleas of the county in which a person resides or is, for his immediate ex-

amination or commitment to an appropriate facility for examination, observation and diagnosis.

(1) The petition may be made by a relative, guardian, friend, individual standing in loco parentis or by the executive officer of an authorized agent of a governmental or recognized nonprofit health and welfare organization or agency or any responsible person.

(2) The petition shall set forth the facts upon which the petitioner bases his belief of mental disability and the efforts made to secure examination of the person by a physician.

(3) Said court upon consideration of such petition shall: (i) issue a warrant requiring that such person be brought before said court;

Second, the trial court determined that a guardian, especially a family member guardian, who, by virtue of court appointment of guardianship and because of the traditional and statutory fiduciary responsibility reposed in the guardian, must be at least a participant in the decision concerning matters affecting the care and treatment of the incapacitated person.

Third, the trial court determined that the Department should have afforded Ms. Easly's family and her guardian a hearing before making the decision to discharge her from Polk Center over their objection. However, the trial court found further that since the parties have had the benefit of extensive hearings, findings and an adjudication of the matter by the trial court as a result of the Secretary's petition under the MH/MR Act of 1966, the hearing rights that the parties would have had before the Department have more than been accomplished.

Lastly, the trial court determined, based upon the evidence presented, that Ms. Easly is better provided for at Polk Center and having her remain at Polk Center is in her best interests and not discriminatory.

The trial court also found that moving Ms. Easly from Polk Center to Cambrian Hills over the rational, well-founded objections of her family and legal guardian was tantamount to moving her to Cambrian Hills over her objection.

Accordingly, the trial court entered an order committing Ms. Easly pursuant to Section 406 of the MH/MR Act of 1966 to Polk Center. The trial court further ordered that before the facility director may remove Ms. Easly from Polk Center to a community based facility without the consent of Ms. Easly's legal guardian and immediate family, the director must first determine that: (1) there has been a change of circumstances from the evidence presented to the trial court and from the findings of the trial court; and (2) the move is in Ms. Easly's best interests. Finally, the trial court ordered that if Ms. Easly, via her legal guardian and immediate family, objected to the removal of Ms. Easly from Polk Center to a community based facility, the Department shall afford Ms. Easly and her legal guardian a hearing as contemplated in Title 55, Chapter 275 of Department regulations.[8] This ap-

(ii) fix a date for a hearing which shall be as soon as the warrant is executed; and (iii) notify the parties in interest.

(4) After hearing, said court may: (i) order an immediate examination by two physicians appointed by said court, or (ii) order the commitment of the person believed to be mentally disabled, to a facility for a period not exceeding ten days for the purpose of examination. If the examination can be accomplished by partial hospitalization said court may so direct.

(b) If, upon examination, it is determined that such person is in need of care at a facility, the examining physicians or director, as the case may be, shall immediately report to said court which may order the commitment of such person for care and treatment.

In its order of commitment, said court may permit partial hospitalization or outpatient care, or if at any time thereafter the director shall determine such partial hospitalization or

outpatient care to be beneficial to the person so committed, the same may be permitted by said court upon application by the director. 50 P.S. § 4406.

8. Tile 55, Chapter 275 governs appeals and fair hearings. Section 275.1 provides, in pertinent part, as follows:

(a) *Right to appeal and have a fair hearing.* The policy with regard to the right to appeal and have a fair hearing will be as follows:

(1) The freedom of the applicant or recipient to request a hearing is a fundamental right and is not to be limited or interfered with in any way.

(2) The regulations contained in this chapter, in accordance with the law, afford every person applying for or receiving a money payment, medical assistance, food stamps or services the right to appeal from a Departmental action or failure to act and

peal by the Secretary followed.[9]

## II. ISSUES

The issues raised by the Secretary in this appeal are as follows:

(1) Whether the trial court can lawfully add to or subtract from the requirements governing community placement for persons with mental retardation under federal and state statutory law;

(2) Whether the trial court can lawfully impose a requirement for a pre-discharge administrative hearing when such requirement is inconsistent with federal and state statutory law; and

(3) Whether, under the unusual facts of this case, Ms. Easly should be committed to a group home so as to permit her long-term care in the community.

## III. DISCUSSION

**A. ISSUE 1—Whether the trial court can lawfully add to or subtract from the requirements governing community placement for persons with mental retardation under federal and state statutory law.**

The ADA prohibits a public entity from discriminating against disabled individu-

als.[10] *See* 42 U.S.C. § 12132. In *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the United States Supreme Court interpreted the anti-discrimination provision contained in the public services portion or Title II of the ADA, 42 U.S.C. § 12132, and held that "the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions." *Olmstead*, 527 U.S. at 582, 119 S.Ct. 2176. "[U]njustified institutional isolation of persons with disabilities is a form of discrimination." *Id.* at 582, 119 S.Ct. 2176. Accordingly, the Supreme Court held that States are required to provide community based treatment for persons with mental disabilities when: (1) the State's treatment professionals determine that community placement is appropriate; (2) the affected persons do not oppose transfer from institutional care to a less restrictive setting; and (3) the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities. *Id.*

Herein, there is no dispute that Ms. Easly is disabled within the meaning of the

---

to have a hearing if he is dissatisfied with a decision refusing or discontinuing assistance in whole or in part.

(3) As used in this chapter, the term departmental includes, in addition to County Assistance Offices, agencies which administer or provide social services under contractual arrangements with the Department.

(4) The term assistance as used in this chapter means a money payment, medical assistance, food stamps and services.

(i) *Right of appeal.* Therefore, the opportunity for a hearing will include the right of appeal from the following:

(A) A denial, suspension or discontinuance in whole or in part.

(B) A change in the amount of payment.

(C) A denial, discontinuance, reduction or exclusion from a Departmental service program including the failure to take into account the client's choice of a service or a determination that he must participate in a service program.

55 Pa.Code § 275.1(a).

9. Pennsylvania Protection and Advocacy, Inc. and ARC Allegheny have filed with this Court a brief for amici curiae in support of the Secretary's appeal.

10. The ADA defines disability, with respect to an individual, as

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

ADA. The Secretary argues that Title II of the ADA requires community care for Ms. Easly. The Secretary argues that the three conditions for placing Ms. Easly in a community setting, as set forth in *Olmstead*, have been satisfied and that the trial court found facts meeting the *Olmstead* criteria. The Secretary points out that the trial court found that the staff at Polk Center, as part of a team, concluded that Ms. Easly could function appropriately in a community group home. In addition, the Secretary argues, the trial court acknowledged that the guardian's mental retardation professional confirmed that a group home is an appropriate placement for Ms. Easly. Next, the Secretary argues that Ms. Easly never opposed community placement despite ample opportunity to do so; therefore, there was nonopposition to community placement, which is all *Olmstead* requires. The Secretary contends that *Olmstead* does not require "competent" nonopposition. The Secretary also argues that condition three, funding, is satisfied because the Commonwealth is the only party with standing to raise the issue and the Commonwealth has not raised it.

Based upon the trial court's findings, we conclude that the first criterion set forth in *Olmstead* has been satisfied and that whether the third criterion has been satisfied is not an issue. Accordingly, the issue is whether the second criterion set forth in *Olmstead*, requiring that the affected person does not oppose transfer from institutional care to a less restrictive setting, has been satisfied.

We do not agree with the Secretary's interpretation of the Supreme Court's second criterion. The Secretary's notion that *Olmstead* only requires nonopposition not "competent" nonopposition is, as the guardian contends, a bizarre theory.

Even a cursory review of the Supreme Court's decision in *Olmstead* reveals that the two petitioners in *Olmstead* had both been voluntarily committed to institutions and were petitioning to be removed to a community based treatment program. Obviously then the petitioners did not object to community placement but instead were desirous of the same and brought suit to reach their desire. Accordingly, the Supreme Court did not address or even mention what constitutes opposition in a case, such as the one presented herein, where the disabled person is totally incapacitated and has no ability to communicate a conscious, informed and intelligent decision as to her preference. Moreover, the Secretary's theory regarding "competent" nonopposition effectively removes the "voluntary" aspect from the disabled person's right to choose. The Supreme Court in *Olmstead* stated:

> Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it. See 28 CFR § 35.130(e)(1) (1998) ('Nothing in this part shall be construed to require an individual with a disability to accept an accommodation ... which such individual chooses not to accept.'); 28 CFR pt. 35, App. A, p. 450 (1998) ('Persons with disabilities must be provided the option of declining to accept a particular accommodation.').

*Olmstead*, 527 U.S. at 603, 119 S.Ct. 2176.

If *Olmstead* stands for the proposition that "competent"nonopposition is not required, the foregoing is meaningless. The Supreme Court clearly set forth that federal law requires that a person with a disability must be provided the option of declining to accept a particular accommodation. We do not believe that it was the intent of the Supreme Court to effectively remove this federally mandated option by not specifically requiring "competent" nonopposition. What is clear from the Supreme Court's decision in *Olmstead*, and

the federal law cited therein, is that placement in a community based facility must be voluntary and by only requiring nonopposition instead of "competent" nonopposition, as advanced by the Secretary, would result in the removal of the voluntary aspect of placement in such a facility.

Although the Secretary attempts to distinguish the United States Supreme Court's decision in *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), on the basis that the case deals with commitment to a state mental hospital rather than admission to a group home, we find the decision rather helpful with respect to the issue of choice where an incompetent person is concerned. In *Zinermon*, Burch brought suit alleging that he was deprived of his liberty, without due process of law, by his admittance to Florida State Hospital as a "voluntary" mental patient when he was incompetent to give informed consent to his admission. The Supreme Court held that Burch's confinement without a hearing or any other procedure to determine either that he validly had consented to admission, or that he met the statutory standard for involuntary placement, clearly infringed on his liberty interest. *Zinermon*, 494 U.S. at 131, 110 S.Ct. 975. The Supreme Court noted that, "[o]f course, if Burch had been competent to consent to his admission and treatment at [Florida State Hospital], there would have been no deprivation of his liberty at all. . . . Burch alleges, however, that he was not competent, so his apparent willingness to sign the admission forms was legally meaningless." *Id.* at 131 n. 17, 110 S.Ct. 975. Thus, the Supreme Court's decision in *Zinermon* buttresses the notion that nonopposition to placement in a community based facility, as contemplated in *Olmstead*, must be "competent" nonopposition; otherwise, the choice would be legally meaningless.

Accordingly, we reject the Secretary's position that all three of the *Olmstead* criterion have been established by virtue of the fact that *Olmstead* only requires nonopposition instead of "competent" nonopposition. This naturally leads us to the question addressed by the trial court—if an individual disabled person has the right to object to community placement, and the individual is incapacitated and unable to convey her objection, who speaks for the individual? The trial court determined that a guardian, especially a family member guardian, who, by virtue of the court appointment of guardianship and because of the traditional and statutory fiduciary responsibility reposed in the guardian, must be at least a participant in the decision concerning matters affecting the care and treatment of the incapacitated person.

The Secretary contends that the trial court erred in this determination because *Olmstead* neither declares, suggests nor even hints that relatives or guardians can veto community placement if *Olmstead's* three conditions for community placement are satisfied. This determination was based, the Secretary contends, upon the trial court's erroneous view that a "competent consent" standard is applicable here. However, we have already rejected the Secretary's arguments in this regard.

Section 5502 of the Incapacitated Persons Act, 20 Pa.C.S. § 5502, sets forth the purpose of the act as "establishing a system which[, *inter alia*,] permits incapacitated persons to participate as fully as possible in all decisions which affect them . . . ." The guardian is vested with the care and management of the person under legal disability. *In re Terwilliger*, 304 Pa.Super. 553, 450 A.2d 1376 (1982). When appointed, the guardian becomes an officer of the court and is always under the court's control and subject to its directions as to the person of the ward. *Id.*

■ The Secretary argues that because the Incapacitated Persons Act prohibits a guardian to admit an incapacitated person to an inpatient psychiatric facility or State center for the mentally retarded, Mr. Dvorchak, as Ms. Easly's, guardian, has no authority to exercise Ms. Easly's rights in this situation.[11] However, it is ·the Secretary that is seeking an order to commit Ms. Easly to Cambrian Hills. Mr. Dvorchak is not attempting to have Ms. Easly admitted to Polk Center or Cambrian Hills. Her mother admitted Ms. Easly to Polk Center when Ms. Easly was still a minor child. Mr. Dvorchak, as Ms. Easly's guardian, is now only attempting to protect Ms. Easly's right to participate in a decision affecting her care and exercise Ms. Easly's right to reject to placement at Cambrian Hills, a community based facility, and remain at Polk Center. Pursuant to *Olmstead*, this is a right granted to Ms. Easly as an institutionalized disabled person.

■ Therefore, we hold that the trial court did not err by determining that a guardian must be at least a participant in the decision concerning matters affecting the care and treatment of the incapacitated person. Moreover, we also hold that the trial court properly found that moving Ms. Easly from Polk Center to Cambrian Hills over the rational, well founded objections of her legal guardian was tantamount to moving Ms. Easly to Cambrian Hills over her objection; therefore, moving Ms. Easly from Polk Center to Cambrian Hills was without her consent and over her objection. Accordingly, the three criteria set forth in *Olmstead* were not satisfied.

Next, the Secretary argues that the MH/MR Act of 1966 requires community care for Ms. Easly and prohibits institutional care for her. The Secretary contends that the trial court's order committing Ms. Easly to Polk Center violates 55 Pa.Code § 6250.11. The Secretary argues that pursuant to Section 6250.11, the court must determine that community care is not feasible before committing a person to an institution and that the trial court failed to make that finding in this case. Therefore, the Secretary contends, the trial court's April 12, 2000 order committing Ms. Easly to Polk Center is unlawful.

Section 6260.11 governs involuntary commitment procedures. As acknowledged by the Secretary, this section codifies a stay order entered by a federal court enjoining Section 406 of the MH/MR Act of 1966 as unconstitutionally vague as applied to persons subject to commitment to state mental institutions. *See Goldy v. Beal*, 429 F.Supp. 640 (M.D.Pa.1976). Section 6250.11 does set forth the specific conditions upon which a person may be committed pursuant to Section 406 to a state mental institution.[12] However, 55

---

11. Section 5521(f) of the Incapacitated Persons Act, 20 Pa.C.S. § 5521(f), provides that a court may not grant to a guardian powers controlled by other statute including the power to admit the incapacitated person to an inpatient psychiatric facility or State center for the mentally retarded.

12. Section 6250.11 is found in Chapter 55 of Department regulations under the heading "Involuntary Commitment Procedures" and provides as follows:

§ 6250.11 Determination.

Until new legislation is enacted, and becomes effective, commitments of mentally retarded adults under section 406 of the [MH/MR Act of 1966] (50 P.S. § 4406) may be processed provided that the Secretary of Public Welfare, his agents and assigns, those under his direction, and all facility directors may not receive a person committed under section 406 of the [MH/MR Act of 1966] (50 P.S. § 4406) except upon judicial determination that the standards in this section are met: A person shall be determined to be a mentally retarded person in need of residency placement only upon the following findings:

Pa.Code § 6250.11 does not address an institutionalized individual's right to object to transfer from an institution, such as Polk Center, to a community based facility, such as Cambrian Hills. As aptly pointed out by the Court of Common Pleas of Dauphin County in *In re Baer,* 44 Pa. D. & C. 4th 225 (1999), Section 406 of the MH/MR Act of 1966 and its regulations, which include 55 Pa.Code § 6250.11, were probably not written with the idea of transfer in mind but rather initial placement.

In *Baer,* the Dauphin County Mental Health/Mental Retardation Case Management Unit sought an order to involuntarily commit a profoundly retarded adult man, who had resided at a state center for 44 years, into a community residential program against the objections of his parents-guardians. One of the arguments advanced by the Dauphin County MH/MR was that statutory authority to make discharge and placement decisions are solely vested by the MH/MR Act of 1966 in the facility director and county. The Dauphin County MH/MR argued further that since the law requires placement in the least restrictive alternative, they had no choice but to petition for his placement in the only viable placement choice—a community based home.

The Dauphin County Court disagreed because the fiction in the Dauphin County MH/MR's argument was that it assumed that the resident's 44 years of residency at the state center were completely irrelevant to the court's inquiry; that the court should decide the resident's residency placement as if making an initial placement decision between a state center and community based home. *Baer,* 44 Pa. D. & C. 4th at 249–50. The Dauphin County Court stated that "[c]ertainly under both state and federal law, [the resident] is entitled to live in an environment that is the least restrictive alternative available." The Dauphin County Court held, however, that "the law indicates a preference for the least restrictive alternative, not a mandate." *Id.* at 250. The Dauphin County Court pointed out *Olmstead's* recognition of an element of choice between an existing institutional placement and a proposed transfer to a community based treatment facility. *Id.* at 251. The Dauphin County Court determined that there was no State regulation specifically precluding the State or its agencies from imposing community based treatment on patients who do not desire it. *Id.* However, the Dauphin County Court stated that it did not find in the State law a mandate that required the court to transfer a mentally retarded individual from a State institution to a community based facility. *Id.* at 252. Therefore, the Dauphin County Court concluded that State law did not preclude a mentally retarded person from making a choice of proposed placement alternatives where one viable alternative is remaining in an institutional setting where his needs have

(1) The person is impaired in adaptive behavior to a significant degree and is functioning at an intellectual level two standard deviation measurements below the norm as determined by acceptable psychological testing techniques.

(2) The impairment and the resultant disability were manifested before the person's 18th birthday and are likely to continue for an indefinite period.

(3) The person, because of his retardation, presents a substantial risk of physical injury to himself or physical debilitation as demonstrated by behavior within 30 days of the petition which shows that he is unable to provide for, and is not providing for his most basic need for nourishment, personal and medical care, shelter, self-protection and safety and that provision for such needs is not available and cannot be developed or provided in his own home or in his own community without residential placement.

55 Pa.Code § 6250.11

been appropriately and satisfactorily met for almost his entire lifetime. *Id.* Accordingly, based upon the circumstances of the case, the Dauphin County Court held that the State center where the resident had resided for 44 years was the most appropriate placement and the least restrictive alternative. *Id.* at 252–61.

■ We embrace the Dauphin County Court's reasoning and conclusions in this matter. Herein, we are not dealing with an initial placement into an institution. Ms. Easly's parents admitted Ms. Easly, who is now seventy-two years old, to Polk Center when she was fourteen and she has remained there her entire life. The Secretary in this matter is seeking an order committing Ms. Easly to a community based facility because the Department was unable to accomplish the same by removing Ms. Easly from Polk Center via a temporary leave or discharge and placing her in Cambrian Hills. By entering an order committing Ms. Easly to Polk Center instead of Cambrian Hills, the trial court preserved Ms. Easly's right to reject the placement at Cambrian Hills and remain at Polk Center.

■ Moreover, the trial court determined that Polk Center, under the circumstances of this case, is not a more restrictive setting than Cambrian Hills. The trial court found that having Ms. Easly remain at Polk Center is in her best interests and not discriminatory. The trial court determined that Ms. Easly has her own room at Polk Center and she has fifteen other residents, a large number of staff including LPN's, therapists, social workers, and direct caregivers, many of whom she has known for years, even decades, with whom to interact with on a constant basis. The trial court found that Ms. Easly visits the senior center and, on many days, she goes to dances, restaurants, ball games, and for picnics in

the park. The trial court determined that while Ms. Easly cannot articulate a preference, she is able to communicate her immediate likes and dislikes to those around her. The trial court determined that those who have gotten to know Ms. Easly and can read her emotions are better able to care for her and that by her actions and history, she is, and has been, comfortable at Polk Center. The trial court stated that its view of Ms. Easly and her living environment at Polk Center demonstrated that she is at ease and comfortable in the facility. Finally, the trial court concluded that Ms. Easly is better provided for at Polk Center. A review of the record reveals that the record supports the trial court's findings and conclusions.

Accordingly, the trial court properly entered an order committing Ms. Easly to Polk Center.

**B. ISSUE 2—** Whether the trial court can lawfully impose a requirement for a pre-discharge administrative hearing when such requirement is inconsistent with federal and state statutory law.

### 1. FEDERAL LAW

The Secretary argues that the conditions imposed upon Ms. Easly's commitment by the trial court are unlawful. The Secretary first contends that the trial court's imposition of the requirement of a pre-discharge hearing in its April 12, 2000 commitment order violates federal law. The Secretary contends that the trial court predicated its requirement for a pre-discharge hearing on the premise that discharge from Polk Center would mean a change in the "level of care." The Secretary contends that this premise is false and that there is no "level of care" change within the meaning of federal law; there-

fore, there is no requirement for a pre-discharge hearing.

The Secretary concedes that Ms. Easly will always require an intermediate care facility for the mentally retarded [13] (ICF/MR) level of care. However, the Secretary argues, since 1981, the need for an ICF/MR level of care has not meant need for care in an ICF/MR, for that level of care can often be provided in community settings though the ICF/MR "waiver" program. The Secretary contends that the need for an ICF/MR "level of care" is a condition of eligibility for the waiver, so waiver care, by statute, must be an ICF/MR level of care.

The Secretary argues further that the professional staff at Polk Center, the Cambria County MH/MR Office and the pro-vider Cambrian Hills collectively determined that Ms. Easly could benefit from community care in the waiver program. This determination, the Secretary contends, if implemented, would result in a change in the *location* of care, not the *level* of care. The Secretary argues that changes in location of care of an ICF/MR resident do not trigger any right to a hearing pursuant to federal regulations, 42 C.F.R. § 431.220(a).[14] The Secretary argues that because there was no change in Ms. Easly's level of care, only the location of care, no administrative hearing was required.

The Medicaid program provides federal assistance to states that choose to reimburse certain costs of medical treatment for needy persons, the aged, the blind and

13. Title XIX of the Social Security Act, commonly known as the Medicaid Act, which established the Medicaid program, defines an ICF/MR facility as an "institution (or distinct part thereof) for the mentally retarded or person with related conditions if

(1) the primary purpose of such institution (or distinct part thereof) is to provide health or rehabilitative services for mentally retarded individuals and the institution meets such standards as may be prescribed by the Secretary;

(2) the mentally retarded individual with respect to whom a request for payment is made under a plan approved under this subchapter is receiving active treatment under such a program; and

(3) in the case of a public institution, the State or political subdivision responsible for the operation of such institution has agreed that the non-Federal expenditures in any calendar quarter prior to January 1, 1975, with respect to services furnished to patients in such institution (or distinct part thereof) in the State will not, because of payments made under this subchapter, be reduced below the average amount expended for such services in such institution in the four quarters immediately preceding the quarter in which the State in which such institution is located elected to make such services available under its plan approved under this subchapter."
42 U.S.C. § 1396d(d).

The Department's regulations define an ICF/MR facility as "[a] State operated or non-State operated facility, licensed by the Department ...., to provide a level of care specially to meet the needs of persons who are mentally retarded, or persons with related conditions, who require specialized health and rehabilitative services; that is, active treatment." 55 Pa.Code § 6210.3.

14. This regulation governs when a hearing is required and provides, in its entirety, as follows:

(a) The agency must grant an opportunity for a hearing to:

(1) Any applicant who requests it because his claim for services is denied or is not acted upon with reasonable promptness;

(2) Any recipient who requests it because he or she believes the agency has taken an action erroneously;

(3) Any resident who requests it because he or she believes a skilled nursing facility or nursing facility has erroneously determined that he or she must be transferred or discharged; and

(4) Any individual who requests it because he or she believes the State has made an erroneous determination with regard to the preadmission and annual resident review requirements of section 1919(e)(7) of the Act. 42 C.F.R. § 431.220(a).

the disabled. *Bear,* 44 Pa. C. & C. 4th at 240 (citing 42 U.S.C. §§ 1396–1396v). The Commonwealth of Pennsylvania participates through Section 442.1 of the Public Welfare Code.[15] *Id.* The federal government shares the costs for such care with states that participate, and in return, participating states must comply with requirements imposed by the Medicaid Act and by the Secretary of the United States Department of Health and Human Services. *Id.*

The Medicaid program is called the medical assistance program in Pennsylvania and is administered by the Department. *Id.* The Supreme Court in *Olmstead* explained that "[t]he waiver program provides Medicaid reimbursement to States for the provision of community-based services to individuals who would otherwise require institutional care, upon a showing that the average annual cost of such services is not more than the annual cost of institutional services." *Olmstead,* 527 U.S. at 601 n. 12, 119 S.Ct. 2176. *See* 42 U.S.C. § 1396n(c). To be eligible to participate in the waiver program, an individual must be entitled to medical assistance for services in an ICF/MR facility. 42 U.S.C. § 1396n(c)(2)(B). Though state and federally funded, each county administrator's MH/MR office has the responsibility to implement the waiver program and establish placement guidelines. *Baer,* 44 Pa. D. & C. 4th at 240.

Federal regulations governing the Medicaid program require a hearing only when, *inter alia,* a resident requests it because he or she believes a nursing facility or skilled nursing facility has erroneously determined that he or she must be transferred or discharged. 42 C.F.R. § 431.220(a)(3). The definition of a nursing facility or skilled nursing facility found in the Medicaid Act excludes therefrom any facility that is primarily for the care

and treatment of mental diseases. 42 U.S.C. § 1396r(a). In addition, while a recipient of Medicaid may request a hearing when that person believes an agency has taken an action erroneously, the term "action" is defined to mean a "termination, suspension or reduction of Medicaid eligibility or covered services." 42 C.F.R. § 431.201. *See also King v. Sullivan,* 776 F.Supp. 645 (D.R.I.1991) (The court found that when the State's duty to redetermine eligibility is triggered by a change in a recipient's change of circumstances that could make the recipient eligible for a different level of care, the State must provide the corresponding procedural protections including notice of denial and of the right to administrative review.).

The federal waiver program, however, contains a freedom of choice provision. Pursuant to the Medicaid Act, a waiver shall not be granted unless the State provides assurance that individuals who are determined to be likely to require the level of care provided in an ICF/MR facility are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of services in an ICF/MR facility. 42 U.S.C. § 1396n(c)(2)(C). The regulations accompanying the Medicaid Act specifically provide that the State must provide assurance that when a recipient is determined to be likely to require the level of care provided in an ICF/MR, the recipient or his or her legal representative will be (1) informed of any feasible alternatives available under the waiver and (2) given the choice of either institutional or home and community based services. 42 C.F.R. § 441.302(d)(1), (2). The record shows that the Department has adopted the foregoing in the form of a policy. *See* Certified Record, Guardian Ad Litem Exhibit

15. Act of June 13, 1967, P.L. 31, *as amended,*  62 P.S. §§ 101–1503.

No. 2—Mental Retardation Bulletin Number 00–96–08 Entitled "2176 Waiver Supplemental Grant Agreement for 1996–2000" (Providing that the County shall provide an opportunity for fair hearing to individuals who are not given the choice of home and community based services as an alternative to ICF/MR care or who are denied the services of their choice or the provider(s) of their choice in accordance with Department policy, which is currently set forth in MR Bulletin 99–87–08; titled *Revised Fair Hearing Proceeding Related to Services Under the 2176 Waiver Program.*).

Herein, the trial court found that Cambrian Hills is a waiver facility. Upon review of the record, we conclude that this finding is supported by substantial evidence.

Ms. Cecelia Kittell testified on behalf of the Secretary. R.R. at 43a. Ms. Kittell was formally a waiver coordinator or case manager for the Cambria Count MH/MR Office and is currently employed by Cambrian Hills Center as the residential director for mentally retarded adults. *Id.* Ms. Kittell testified that the waiver program funds the individuals who live at Cambrian Hills. *Id.* at 52a. Ms. Kittell testified further that anybody who lives in Cambrian Hills has to be waiver eligible and waiver funded through a contract with Cambria County. *Id.* Thus, the trial court's finding that Cambrian Hills is a waiver home is supported by Ms. Kittell's testimony.

The trial court also determined that Ms. Easly's discharge from Polk Center to Cambrian Hills was a "level of care" change which triggered Ms. Easly's right to a hearing. Upon our review of the record, we conclude that the trial court's finding that there was a level of care change is not supported by the record

insofar as the trial court's finding pertains to federal law.

The trial court's finding was based upon the testimony of two witnesses called on behalf of the guardian, Mr. Dvorchak. Ms. Norma Hoke, who is employed with the Cambria County MH/MR Office as its waiver coordinator, testified that the transition from Polk Center to Cambrian Hills was the type of level of care change which kicked in the right to a fair hearing and appeal. R.R. at 151a. However, upon review of Ms. Hoke's entire testimony it is clear that she was basing her opinion on the provisions of the federal waiver program that afford a recipient a choice of care and the Department's policy that a recipient will be given a fair hearing if the recipient's choice of care is not honored. R.R. at 151a–52a. *See* 42 U.S.C. § 1396n(c)(2)(C); 42 C.F.R. § 441.302(d)(1), (2); and Certified Record, Guardian Ad Litem Exhibit No. 2—Mental Retardation Bulletin Number 00–96–08 Entitled "2176 Waiver Supplemental Grant Agreement for 1996–2000.

Mr. Dvorchak, as the guardian, also called Mr. Owen Sullivan, Esquire to testify. Attorney Sullivan is the Solicitor of Cambria County. Attorney Sullivan testified that he was previously employed by the Department as an Attorney Examiner II with the Office of Hearings and Appeals. R.R. at 157a. In that capacity, Attorney Sullivan testified that he acted as a hearing examiner in appeals of level of care changes. *Id.* Attorney Sullivan opined that Ms. Easly's transfer from Polk Center to Cambrian Hills was a level of care change for the better that entitled Ms. Easly and her guardian to a perfunctory administrative law hearing. *Id.* at 158a. However, Attorney Sullivan testified further that his opinion was based upon his understanding of the applicability of Title 55, Chapter 275 of the Pennsylva-

nia Code and not the federal waiver statute. *Id.* at 159a.

■ In addition, Ms. Kittell testified that a waiver program is understood to mean the same level of care as care at an ICF/MR facility. *Id.* at 45a. Accordingly, the trial court's finding that Ms. Easly's transfer from Polk Center to Cambrian Hills was a "level of care" change is not supported by the record. Therefore, any requirement by the trial court that a hearing would be required under federal law based upon such a change is erroneous. However, this does not mean that Ms. Easly and her guardian, Mr. Dvorchak, would not be entitled to a hearing pursuant to the federal waiver program in the future. We have concluded herein, as stated above, that the trial court's finding that Cambrian Hills is a waiver home is supported by the record. As such, as testified to by Ms. Kittell, anyone living at Cambrian Hills must be waiver eligible and waiver funded through the county contract.

Therefore, pursuant to the Medicaid Act and federal regulations governing the waiver program, Ms. Easly, through her guardian, must choose to reside at Cambrian Hills or any other waiver home. Ms. Easly cannot be forced to reside at a home funded through the federal waiver program. It is undisputed that Mr. Dvorchak, as Ms. Easly's guardian, when presented with the waiver beneficiary choice form to choose between an ICF/MR and community based services under the approved waiver program, chose Polk Center, an ICF/MR facility. It is also clear therefore, that if the Secretary attempts to transfer Ms. Easly to Cambrian Hills or another waiver home, and her stay is funded through the waiver program, Ms. Easly and Mr. Dvorchak, as her guardian, would be entitled to a hearing because the Department would not be honoring Ms. Eas-

ly's choice pursuant to the waiver program. *See* 42 U.S.C. § 1396n(c)(2)(C); 42 C.F.R. § 441.302(d)(1)(2); Certified Record, Guardian Ad Litem Exhibit No. 2— Mental Retardation Bulletin Number 00–96–08 Entitled "2176 Waiver Supplemental Grant Agreement for 1996–2000."

■ We note that the Secretary argues that the foregoing is not an issue in this matter because Ms. Easly's previous stay at Cambrian Hills was not funded through the waiver program but through state funding. This statement completely contradicts the Secretary's previous argument, in support of her contention that Ms. Easly's placement in Cambrian Hills resulted in a change in the location of care not the level of care, that a professional team collectively determined that Ms. Easly could benefit from community care in the waiver program. Moreover, upon our review of the record, we conclude that the Secretary's assertion that Ms. Easly's stay at Cambrian Hills was funded through state funding and not the federal waiver program is a misstatement.

Mr. Edward J. Sadosky, Polk Center Facility Director, testified on behalf of the Secretary. With respect to the funding of Ms. Easly's stay at Cambrian Hills, Mr. Sadosky testified that he was aware the regional office director was assessing the capability of funding Ms. Easly's placement purely through state dollars as opposed through waiver funds and, consequently, would have made the beneficiary of choice pursuant to the waiver program a moot issue. R.R. at 101a. Mr. Sadosky testified further that the placement of Ms. Easly solely with state dollars was never accomplished because Ms. Easly was brought back to Polk Center. *Id.* Mr. Sadosky testified also that all the placements from Polk Center have been waiver placements so rarely is there a totally state funded placement. *Id.* at 112a.

According to Ms. Kittell's testimony, Ms. Easly's stay at Cambrian Hills was part of a transitional trial or visit and the funding for that type of stay is provided through start up funds. R.R. at 46a. These funds are through a contract with Cambria County MH/MR Unit.[16] *Id.* Ms. Kittell testified further that if Ms. Easly continued to remain at Cambrian Hills without a signed waiver designating Cambrian Hills as beneficiary of choice, she did not know where the funding for Ms. Easly to remain at the group home would come from. *Id.* at 52a. Ms. Kittell testified that if discharged and permanent placement would have occurred at Cambrian Hills, Ms. Easly could not have lived there because everybody who lives in that home has to be waiver eligible and waiver funded. *Id.* And to be waiver funded, Ms. Kittell testified that the appropriate consents need to be in place. *Id.* at 53a.

Thus, contrary to the Secretary's assertion in this appeal, Ms. Easly's stay at Cambrian Hills was not totally state funded and according to Mr. Sadosky a placement is rarely totally state funded. Therefore, Ms. Easly's placement at Cambrian Hills fell within the federal waiver program and if the Secretary attempts to transfer Ms. Easly in the future to Cambrian Hills or another community based facility which is a waiver home, she will have to be placed in compliance with the requirements of the waiver program.

Thus, if the placement is against her guardian's choice, Ms. Easly and her guardian are entitled to a hearing pursuant to the federal waiver program and the Department's own policy.

Accordingly, while the trial court's finding that the transfer from Polk Center to Cambrian Hills was a level of care change that triggered the right to a hearing under federal law is not supported by the record, the trial court's finding that Cambrian Hills is a waiver home is supported by the record. As such, any transfer to that community based group home or another waiver home in the future must be in accordance with federal law, accompanying regulations, and the Department's regulations or policy governing the waiver program. If the Department or the Secretary do not honor Ms. Easly's choice under the federal waiver program, Ms. Easly and her guardian are entitled to a hearing. Therefore, the trial court did not err in ordering that the Department provide Ms. Easly and her guardian a hearing if Ms. Easly objects, via her legal guardian, to Ms. Easly's removal from Polk Center to a community based waiver facility.

### 2. STATE LAW

Next, the Secretary argues that the trial court's imposition of a hearing requirement in the April 12, 2000 commitment order was erroneous because state law has

---

16. Ms. Kittell explained start up funding as it applied to the funding of Ms. Easly's visit at the home as follows:

Q. The start up funding that you refer to, what is that?

A. When a community home is started, the funding allocations are separated the first period, the initial period when the home is being prepared. When the nonconsumers are transitioning generally is start up funding. And then that funding is annualized, coming generally of the fiscal year, once all of the elements are in place. So, it's just two sepa-rate two separate—it's not sources, but they are—they are labeled start up and it's just that. It's all the initial costs up front.

Q. You essentially had funding from the start up fund for Ruth Easly until July of this year?

A. For everybody, including Ruth.

Q. And then after that, in order to get the funding through the Waiver Program, the guardian would have to sign a waiver designating your home as beneficiary of choice?

A. (Nods head affirmatively).

R.R. at 47a.

no provision for pre-discharge hearings and the trial court cannot impose such a requirement. The Secretary contends that the facility director has the power pursuant to Section 420 of the MH/MR Act of 1966, 50 P.S. § 4420, to discharge Ms. Easly from Polk Center and that the trial court lacks authority to block such discharge decisions. The Secretary argues that even if Ms. Easly were to object to her release from Polk Center pursuant to the ADA, her objection would not, under state law, constitute a legal barrier to discharging her from Polk Center because the facility director has sole discretion to decide such matters. The Secretary contends further that because the MH/MR Act of 1966 is subject to the Administrative Agency Law,[17] and because release from mental institutions is specifically excluded from the definition of adjudication under said law, such decisions are not subject to administrative hearing and are not reviewable in any court. Moreover, the Secretary argues, 55 Pa.Code Chapter 275 has specifically been found inapplicable to decisions under the MH/MR Act of 1966.

Initially, the Secretary is correct that Section 101 of the Administrative Agency Law, 2 Pa.C.S. § 101, excludes from the definition of adjudication "releases from mental institutions." In addition, this Court has determined that 55 Pa.Code Chapter 275 does not apply to proceedings brought pursuant to the MH/MR Act of 1966 because 55 Pa.Code Chapter 275 applies to hearings involving recipients of state assistance funds. See Tartaglia v. Department of Public Welfare, 52 Pa. Cmwlth. 579, 416 A.2d 608 (1980) see also Northwestern Institute of Psychiatry v. Department of Public Welfare, 99 Pa. Cmwlth. 213, 513 A.2d 495 (1986) (Chapter 275 of Title 55 of the Pennsylvania Code pertains solely to the hearing rights of welfare recipients and applicants for public assistance.).

We also agree with the Secretary that the Department has the power pursuant to Section 420 of the MH/MR Act of 1966 to review any commitment made under the act, which includes an involuntary commitment, and that the Secretary may order the discharge of any person so committed. However, pursuant to Section 420 the Secretary must find prior to discharge that such committed person is no longer in need of care and treatment in a facility. The intent therefore of Section 420 is that the committed individual no longer requires treatment in any type of facility even a community based residential facility. In other words, the reasons for committing the person to a facility are no longer present and the person may be released from the mental institution.

Therefore, the Secretary is correct in a general sense with regard to the power of the Department to discharge or release a committed individual and that a pre-discharge hearing is not required. But in the present case, it is clear from the record that the Secretary will be hard pressed to find that Ms. Easly is no longer in need of care and treatment in a facility. Thus, the Department and the Secretary would be abusing their authority under the MH/MR Act of 1966 if the Secretary were to discharge or release Ms. Easly from Polk Center without such a finding. Moreover, the Secretary, by filing a petition pursuant to Section 406 of the MH/MR Act of 1966 to commit Ms. Easly to Cambrian Hills, is admitting that Ms. Easly needs to be committed to a facility for treatment and that Cambrian Hills is an appropriate facility to treat Ms. Easly.

17. 2 Pa.C.S. §§ 101–103, 501–508, 701–704.

In reality, Ms. Easly's future "discharge" from Polk Center in order for her to be placed into a community based facility, such as Cambrian Hills, would be a transfer. Section 416 of the MH/MR Act of 1966, 50 P.S. § 4416, governs transfers between facilities and whenever an individual has been committed by a court under the MH/MR Act of 1966, transfers from state to local facilities or vice versa shall be approved by the committing court.[18] While courts interpreting Section 416 have held that this does not always mandate a hearing on the issue, the fact still remains that the transfer cannot take place without the committing court's approval. *See In Re: Civil Court Commitment of William Guzan,* 45 Pa.Cmwlth. 525, 405 A.2d 1036 (1979). In addition, courts have inherent power to supervise the enforcement of their orders. *The Pennsylvania Department of Public Welfare v. Court of Common Pleas of Philadelphia County,* 506 Pa. 410, 485 A.2d 755 (1984). Accordingly, because the trial court's April 12, 2000 order commits Ms. Easly to Polk Center, the Secretary or the Department cannot transfer Ms. Easly from Polk Center to another state or local facility without the trial court's approval.

Thus, we are constrained to agree that if it is determined in the future that Ms. Easly can be discharged from Polk Center because she no longer needs treatment and care in a facility, meaning she will not be treated in any type of facility, Ms. Easly and her guardian do not have the right to a pre-discharge hearing under state law. However, if the Department wishes to transfer Ms. Easly from Polk Center to a community based local facility or another state facility, the trial court must approve the transfer as required by Section 416 of the MH/MR Act of 1966. Therefore, if the trial court in exercising its inherent power to enforce its order or in exercising its authority pursuant to Section 416 determines that a hearing is necessary, the trial court may order a hearing.

**ISSUE 3—Whether Ms. Easly's commitment to a group home is necessary to protect Ms. Easly's interests.**

Finally, the Secretary argues that if the April 12, 2000 commitment order were simply vacated, Polk Center could place Ms. Easly in a group home without further order. But, the Secretary contends, without further order, there would be a risk of a repetition of the precipitous and unauthorized return to Polk Center that occurred on May 18, 1999. The Secretary argues that it was to protect Ms. Easly from such ping-ponging back and forth from Polk to a group home and back again that the Secretary filed the petition for commitment pursuant to Section 406 of the MH/MR Act of 1966. The Secretary argues that utilizing the foregoing procedure to obtain Ms. Easly's commitment to Cambrian Hills, a group home, is lawful and in the best interests of Ms. Easly.

The Secretary's argument in this regard is based upon the assumption that this

---

18. Based on Ms. Kittell's testimony, Cambrian Hills was funded through a contract with Cambria County. R.R. at 46a. Cambria County is obligated to establish county mental health programs under the MH/MR Act of 1966 and to provide for the diagnosis, care, treatment, rehabilitation and detention of the mentally disabled and shall have power to make appropriations for such purposes. Section 301 of the MH/MR Act of 1966, 50 P.S. § 4301. Moreover, as stated previously herein, the Secretary, by filing a petition pursuant to Section 406 of the MH/MR Act of 1966 to commit Ms. Easly to Cambrian Hills, is admitting that Ms. Easly needs to be committed to a facility for treatment and that Cambrian Hills is an appropriate facility to treat Ms. Easly. Thus, Cambrian Hills can be considered a local facility.

Court will hold that Ms. Easly's commitment to Polk Center by the trial court is unlawful. As we have already held otherwise in this opinion, we need not address this issue except to restate that the trial court's findings, based upon the evidence presented, support the conclusion that Ms. Easly's commitment to Polk Center is in her best interests.[19]

Accordingly, the trial court's May 8, 2000 order denying the Secretary's motion for post trial relief from the trial court's April 12, 2000 order is affirmed.

### ORDER

AND NOW, this *26th* day of *February,* 2001, the order of the Court of Common Pleas of Venango County, dated May 8, 2000 at Civ. No. 959–1999, is affirmed.

PELLEGRINI, Judge, Dissenting.

While deinstitutionalization has caused problems both for patients and society, I respectfully dissent to the majority decision because Stephen Dvorchak, the guardian of Ruth Easly (Easly), did not have the right to determine whether Easly should be transferred to another facility.

Easly is a mentally retarded 72–year old woman. At age 14, her parents committed her to Polk Center, an intermediate care facility for the mentally retarded. She has resided at Polk Center since that time. In 1988, Easly's nephew, Stephen Dvorchak (Guardian), was appointed her guardian. In 1998, the Department of Welfare (DPW) determined that Easly could function in a community setting and began planning for her removal to the group home known as Cambrian Hills Center. This was done pursuant to Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131–12165, which prohibits the discrimination of disabled persons and precludes their exclusion from participation in or the denial of the benefits of a public entity's services, programs or activities. Under instruction from Congress, the Attorney General issued regulations implementing Title II as it applied to institutional placement after concluding that unjustified placement or retention of disabled persons that limited their exposure to the outside community constituted a form of discrimination that was prohibited by Title II.

Easly visited the group home several times and was transferred there on February 9, 1999. Guardian opposed Easly's placement at Cambrian Hills Center and she was returned to Polk Center, and DPW then filed a petition with this court to have Easly committed to the group home. Guardian filed preliminary objections and we transferred the matter to the Court of Common Pleas of Venango County (trial court). The trial court determined that Easly's Guardian should have been allowed to participate in the decision regarding her transfer, that Guardian should have been afforded a hearing prior to her transfer, and that based upon the

19. We note that Mr. Dvorchak, as the guardian, points out that he filed preliminary objections to the Secretary's petition for commitment on the basis that Ms. Easly had already been committed to a state institution, therefore, the Department could not resort to Section 406 to undo such prior commitment. Mr. Dvorchak argues that the General Assembly never contemplated the use of Section 406 as a means by which the Department could achieve the forcible transfer to a group home of a person already voluntarily committed to a state institution. In its opinion, the trial court acknowledged that Mr. Dvorchak had filed preliminary objections and stated that his objections were subsumed in the trial court's disposition of the case on the merits. While Mr. Dvorchak's arguments have merit, we will not address this issue because he did not file a cross-appeal from the trial court's order.

evidence presented, Easly was better provided for at Polk Center and having her remain there was in her best interests. The trial court further found that transferring Easly from Polk Center to Cambrian Hills Center, despite the objections of Guardian, was tantamount to moving her to the group home over her objections.

DPW filed an appeal and the majority affirms the trial court's decision. The majority agrees with the trial court that Guardian had the right to participate on Easly's behalf in the decision making process regarding her transfer pursuant to Section 5502 of the Incapacitated Persons Act, 20 Pa.C.S. § 5502, and reject her placement at Cambrian Hills Center, and that she had a right to a pre-discharge hearing because she was being transferred to a "waiver facility." I disagree with the majority because although Guardian had a right to participate in deciding whether Easly should be transferred to another facility, he did not have the right to make that ultimate decision.

Section 5502 of the Incapacitated Persons Act provides, in relevant part, the following:

Recognizing that every individual has unique needs and differing abilities, it is the purpose of this chapter to promote the general welfare of all citizens by establishing a system which permits incapacitated persons *to participate as fully as possible in all decisions which affect them,* which assists these persons in meeting the essential requirements for their physical health and safety, protecting their rights, managing their financial resources and developing or regaining their abilities to the maximum extent possible and which accomplishes

these objectives through the use of the least restrictive alternative... (Emphasis added.)

20 Pa.C.S. § 5502. As can be seen, this Act only allows incapacitated persons or their guardians to participate in decisions that affect them, not to decide the outcome of those issues. While "participation" is not defined under the Act, clearly it limits the incapacitated person to providing input on issues affecting them and certainly does not provide that the incapacitated person or their guardian can decide what is best for that individual.

Relying on *Olmstead v. L.C.,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), interpreting the ADA, the majority equates participation with veto power over placement and holds that Easly had the right to reject any movement to a facility without his approval. It states in its decision that Guardian "is now only attempting to protect Ms. Easly's right to participate in a decision affecting her care and exercise Ms. Easly's right to reject placement at Cambrian Hills, a community based facility, and remain at Polk Center." (Majority decision at p. 853.) *Olmstead,* however, is factually distinguishable from this case.

*Olmstead* dealt with unwarranted institutionalization, i.e., a more restrictive setting, of two mentally retarded women confined to a hospital psychiatric unit who were refused appropriate placement in a community-based program, i.e., a less restrictive setting. The United States Supreme Court interpreted Title II of the ADA, 42 U.S.C. § 12132,[1] finding that the proscription of discrimination might require the placement of persons with mental disabilities in community settings rather than in institutions, and unjustified

---

1. 42 U.S.C. § 12132 provides:
   Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

institutional isolation of persons with disabilities was a form of discrimination. It held that states were required to provide community based treatment for persons with mental disabilities when (1) the state's treatment professionals determined that community placement was appropriate; (2) the affected persons did not oppose the transfer from institutional care to a less restrictive setting; and (3) the placement could be reasonably accommodated, taking into account the resources available to the state and the needs of others with mental disabilities.

While *Olmstead* held that a transfer to a community based treatment facility was required because it was a less restricted setting, here, the exact opposite is true. Having the right to be transferred to a less restrictive setting pursuant to the ADA to prevent discrimination does not conversely translate into having the right to oppose the transfer from a more restrictive setting. Although the majority determines that Easly opposed the transfer via her Guardian, under the Act, all that is required is that the affected person be permitted to participate in the decision, i.e., provide input; they are not given veto power.

Any objection made by a guardian is tantamount to a preference and cannot be the basis for determining that the transfer should not take place. Because the government is paying for Easly's care, aside from participating in the decision, her Guardian does not have the right to challenge any state decision absent a showing that the care would be inadequate. Because a pre-discharge hearing would not be required, I dissent.

Judge FLAHERTY joins.